## In re RAPIER, Petitioner.

## In re DUPRÉ, Petitioner.

## In re DUPRÉ, Petitioner.

### ORIGINAL.

Nos. 7, 8, 9, Original.   Argued November 16, 17, 1891. — Decided February 1, 1892.

Section 3894 of the Revised Statutes, as amended by the act of September 19, 1890, 26 Stat. 465, c. 908, which provides that "no letter, postal card or circular concerning any lottery . . . and no list of the drawings at any lottery . . . and no lottery ticket or part thereof . . . shall be carried in the mail, or delivered at or through any post-office, or branch thereof, or by any letter-carrier"; and that no newspaper "containing any advertisement of any lottery" "shall be carried in the mail, or delivered by any postmaster or letter-carrier"; and that "any person who shall knowingly deposit or cause to be deposited . . . anything to be conveyed or delivered by mail in violation of this section . . . shall be deemed guilty of a misdemeanor, and on conviction shall be punished by a fine of not more than five hundred dollars or by imprisonment for not more than one year," is a constitutional exercise of the power conferred upon Congress by Art. I, sec. 8 of the Constitution, to establish post-offices and post-roads, and does not abridge "the freedom of speech or of the press," within the meaning of Amendment I to the Constitution.

*Ex parte Jackson,* 96 U. S. 727, affirmed to the points;

(1) That the power vested in Congress to establish post-offices and post-roads embraces the regulation of the entire postal system of the country, and that under it Congress may designate what may be carried in the mail and what excluded;

(2) That in excluding various articles· from the mails the object of Congress is, not to interfere with the freedom of the press, or· with any other rights of the people, but to refuse the facilities for the distribution of matter deemed injurious by Congress to the public morals;

(3) That the transportation in any·other way of matter excluded from the mails is not forbidden.·

THESE were three applications to this court for leave to file petitions for writs of habeas corpus. Leave was granted, March 9, 1891, and the petitions were made returnable on the third Monday of the·next April. They were duly returned, and were on the 27th of April assigned for argument at the present term. The prayer in each case was for·a discharge from arrest for an alleged violation of the provisions of section 3894 of the Revised Statutes, as amended by the act of September 19, 1890, 26 Stat. 465, c. 908, generally known as the anti-lottery act, which is printed in the margin.[1]

---

[1] Chap. 908. An act to amend certain sections of the Revised Statutes relating to lotteries, and for other purposes.

*Be it enacted by the Senate and House of Representatives of the United States of America in Congress assembled,* That section thirty-eight hundred and ninety-four of the Revised Statutes be, and the same is hereby, amended to read as follows:

" SEC. 3894. No letter, postal-card or circular concerning any lottery, so-called gift-concert, or other similar enterprise offering prizes dependent upon lot or chance, or concerning schemes devised for the purpose of obtaining money or property under false pretences, and no list of the drawings at any lottery or similar scheme, and no lottery ticket or part thereof, and no check, draft, bill, money, postal-note or money order for the purchase of any ticket, tickets or part thereof, or of any share or any chance in any such lottery or gift enterprise, shall be carried in the mail or delivered at or through any post office or branch thereof, or by any letter-carrier; nor shall any newspaper, circular, pamphlet or publication of any kind containing any advertisement of any lottery or gift enterprise of any kind offering prizes dependent upon lot or chance, or containing any list of prizes awarded at the drawings·of any such lottery or gift enterprise, whether said list is of any part or of all of the drawing, be carried in the mail or delivered by any postmaster or letter-carrier. Any person who shall knowingly deposit or cause to be deposited, or who shall knowingly· send or cause to· be sent, anything to be conveyed·or delivered by mail in violation of this section, or who shall knowingly cause to be delivered by mail anything herein forbidden to be carried by mail, shall be deemed guilty of·a mis-

Rapier was arrested under an information in the District Court for the Southern District of Alabama.

Dupré was arrested under two indictments in the Circuit Court for the Eastern District of Louisiana.

The charge against Rapier, and against Dupré in one indictment, was the mailing of a newspaper containing an advertisement of the Louisiana Lottery ; and in the other indictment against Dupré was for the mailing of a letter concerning it.

As a cause for the issue of the writ Rapier said, in his application : " Your petitioner avers that he is now in the custody of said marshal under or by color of the authority of the United States and in violation of the Constitution of the United States. Your petitioner is advised that the pretended statute under which he is being prosecuted and held is in violation of the Constitution of the United States, and that the said District Court is without jurisdiction in the premises."

Dupré in No. 8 averred that he was " deprived of his liberty under and by color of the authority of the United States and of said court and in violation of the Constitution of the United States and of his rights as a citizen thereof, because he says that he is advised and therefore avers that the statute of the United States under which he is held and being prosecuted upon said indictment is unconstitutional, null and void, and particularly obnoxious to and in violation of the first amendment to said Constitution, which forbids Congress passing any law abridging the freedom of the press, and that therefore said Circuit Court is and was without jurisdiction in the premises, and he is deprived of his liberty without authority of law."

His petition in No. 9 contained substantially the same averment.

---

demeanor, and on conviction shall be punished by a fine for not more than five hundred dollars, or by imprisonment for not more than one year, or by both such fine and imprisonment for each offence. Any person violating any of the provisions of this section may be proceeded against by information or indictment and tried and punished, either in the district at which the unlawful publication was mailed, or to which it is carried by mail for delivery according to the direction thereon, or at which it is caused to be delivered by mail to the person to whom it is addressed."

*Mr. Hannis Taylor* for Rapier.

*Mr. James C. Carter* and *Mr. Thomas Semmes* for Dupré.

*Mr. Attorney General* and *Mr. Assistant Attorney General Maury* for the United States.

These cases were argued by the above named counsel, an extension of time being allowed by the court. In view of the impossibility of reporting all *seriatim*, the arguments for the petitioners are represented below by a synopsis of *Mr. Carter's* brief, and those for the government by an abstract of *Mr. Maury's* argument.

*Mr. James C. Carter* for Dupré, petitioner.

I. The power of Congress is limited in two ways. *First*, it can exercise no power which has not been conferred upon it by the Constitution. *Second*, it cannot exercise the powers which have been thus bestowed in ways, or for purposes, which the Constitution forbids.

Our first proposition is that the statute in question is invalid, as being an attempt to exercise powers not conferred upon Congress.

1. It is not denied that Congress, in the exercise of the power conferred upon it by the Constitution "to establish post-offices and post-roads," is clothed with the full incidental power of regulating such offices and roads; — in other words, of regulating the mail service. Nor is it denied that this incidental power of regulation embraces the power of so limiting the carriage of matter by mail as to render that service practicable ; and consequently embraces a power of excluding matter from the mails for that purpose and to that extent. What we do assert is that any incidental powers which Congress may thus exercise must be such only as, in the language of the Constitution, "are necessary and proper" for carrying into execution a general power expressly conferred ; and that whether any such incidental power is "necessary and proper"

must be, as this court has always regarded it, a judicial question. *McCulloch* v. *Maryland*, 12 Wheat. 316, 420.

The first form which the judicial inquiry assumes is, whether the means employed by Congress in executing its admitted powers are appropriate, and apparently conducive to the legitimate end. If they are so, it matters not whether or not they are the best and most effective means. Congress may fail in the effort to select these. But they must be means; in other words, they must have some relation to the end — some tendency to accomplish it. Applying this test the statute in question is plainly invalid. This seems scarcely to admit of debate.

The legitimate end is to furnish mail facilities to the people of the United States; and this means to all the people of the United States. But the statute in question makes the *moral character* of the matter the sole ground of exclusion. The fact that the mail service has been maintained for a century without such exclusion is sufficient to show that it is not *conducive* to the mere end of establishing a mail service.

We are not, at this moment, objecting that the statute is invalid because aimed to accomplish an object beyond the power of Congress, or because forbidden by some express prohibition of the Constitution. Our argument now is that being an attempted exercise of incidental powers it is condemned by an implied prohibition of the Constitution, because the means employed by it plainly appear to be in no manner conducive to the only legitimate end for which we now assume they could be employed, namely, the maintenance of the mail service. *United States* v. *Fox*, 95 U. S. 670; *United States* v. *Reese*, 92 U. S. 214; *Dent* v. *West Virginia*, 129 U. S. 114; *Cummings* v. *Missouri*, 4 Wall. 277; *Ex parte Garland*, 4 Wall. 333.

Courts of justice always avoid, so far as possible, any inquiry into the *motives* of legislators. They never indulge in it so far as to seek, through the instrumentality of evidence, what such motives are, with the view of invalidating the exercise of admitted powers. A grant which a legislature has authority to make cannot be avoided by proof of fraud in the individual legislators. *Fletcher* v. *Peck*, 6 Cranch. 87. But

it is often the case that an act of a legislative body may be conducive to either of two objects, one of which may be within the scope of the legislative power, and the other beyond it. In such cases if the manifest purpose, or the necessary effect, of any legislation be to reach an end beyond the legislative power, it is condemned as unconstitutional. The illustrations of this rule of action are multitudinous. *City of New York v. Miln*, 11 Pet. 102; *The Passenger Cases*, 7 How. 283; *Barbier* v. *Connolly*, 113 U. S. 27; *Soon Hing* v. *Crowley*, 113 U. S. 703; *Yick Wo* v. *Hopkins*, 118 U. S. 356; *Morgan's Steamship Co.* v. *Louisiana*, 118 U. S. 455; *Ouachita Co.* v. *Aiken*, 121 U. S. 444; *Minnesota* v. *Barber*, 136 U. S. 313. In the latter case it is held that, in applying this doctrine, while we are not permitted to inquire by means of facts given in evidence, into the motives of individual legislators, we are permitted and enjoined to ascertain the purpose, so far as it is manifest upon the face of the legislation, or inferable from its necessary effects.

It would, of course, be entirely repugnant to the spirit of the Constitution, and to the equality of the States and the general government in their respective spheres of sovereign action, if the same rule were not applied in determining the validity of a congressional enactment. Applying this doctrine to the statute before the court, and inquiring what its natural and necessary effect and its manifest purpose are, no one will pretend that there is room for doubt. It was passed simply and solely for the purpose of disfavoring, and, if possible, of suppressing lotteries. It is not necessary to resort to the report of the committees introducing the original bill, and which openly avows this as the sole purpose, for it is obvious and undisputable on the face of the act itself. And so it has been declared by this court. *Ex parte Jackson*, 96 U. S. 727. Here the argument upon this branch of the case properly closes; for no one will assert that Congress has power to suppress lotteries any more than it has to suppress any other employment or pursuit.

2. But it would be an oversight to omit to notice a different view upon which an attempt may be made to defend the

validity of this legislation, a view indeed upon which the bill already referred to forbidding the delivery of alleged incendiary abolition documents was defended by Senator Buchanan in 1836, in the Senate of the United States. That distinguished statesman insisted that the proposed measure should not be viewed as an affirmative exclusion of such documents from the mails, but as a refusal by the government to become an agency to furnish means and facilities for the circulation of such publications. And it may be asked here, as he asked in respect to abolition publications, "must the United States make itself the agent of dealers in lotteries and facilitate that business?". It must be that there is some plausibility in this argument, since it has commanded the assent of such able minds; but it has nothing more than plausibility.

Inasmuch as a denial of mail facilities to persons wishing to carry on any particular pursuit must, of necessity, so far impede it as to greatly abridge the extent to which it may be carried on, and in many instances render it impossible; and as the argument under notice asserts the absolute right of Congress, in its uncontrollable discretion, to refuse the facilities in any case, (and such was Mr. Buchanan's view,) it involves the assertion that Congress has the right, by such action, to break up, or impede, any business or employment. It also involves the assertion, generally, that Congress, in making provision for the actual and beneficial enjoyment by the people of the powers, privileges and franchises bestowed by the Constitution, is clothed with a discretion, wholly arbitrary, to give them here, and withhold them there, as it may please. But the doctrine of this court is that the fundamental rights of citizens — and these, certainly, must include all the rights and privileges which are bestowed by the Constitution — can be taken away only by due process of law; and this does not include the arbitrary mandate of the legislature. *Dent* v. *West Virginia*, 129 U. S. 114, 123; *Yick Wo* v. *Hopkins*, 118 U. S. 356, 369; *Loan Association* v. *Topeka*, 20 Wall. 655, 662, 663; *Ex parte Curtis*, 106 U. S. 371, 376, dissenting opinion of Mr. Justice Bradley.

3. But we insist that Congress has no power to exclude

matter concerning lotteries from the mails on the ground that the circulation of such matter would have an immoral or injurious tendency. That this was its real purpose has already been shown. In enacting that statute it was not exercising the power of regulating the mail service, for there was no relation between the means employed and *that* end. The real power which it attempted to exercise was to hamper and impede, and, if possible, to destroy, the lottery business, in order to protect the people of the United States from the assumed demoralizing and dangerous tendency of lotteries. Inasmuch as no one pretends that Congress may pass a law directly suppressing lotteries on the ground that they have an immoral tendency, or, indeed, on any ground whatever, the question is whether it can pass a law, not directly suppressing them by declaring them to be crimes, but harassing and obstructing them by withdrawing from them facilities which are under its control for no other reason than that it deems them crimes which it would suppress if it had the power? This question must be promptly answered in the negative, for the power thus attempted to be exercised is a power to suppress lotteries and that alone. No such power can be derived from any express language in the Constitution, nor by any just implication from any language in it. More than this, the possession of any such power by Congress is utterly inconsistent with the whole theory of the constitutional relations between the general government and the States. Against all such views we respectfully insist that where Congress cannot by direct legislation pronounce a business to be a crime and punish it as such, but that power has been reserved to the States, it is not competent to Congress to determine it to be a crime, and to deprive it of the benefit of the mails for the sole purpose of endeavoring to suppress it. What cannot be done directly cannot be done indirectly. Cooley's Constitutional Limitations, 208; *Taylor* v. *Commissioners of Ross County*, 23 Ohio St. 22.

A plausible attempt may be made to retort upon us the argument drawn from possible consequences. "Is it true, then," it may be asked, "that the government of the United

States is placed in the singular attitude that it cannot discharge its duty of maintaining· a mail service without extending the facilities which that service affords to criminals of every description to aid them in the commission of crime? Cannot that government decline to become the principal instrumentality in the circulation, for instance, of obscene books and pictures, without an entire abrogation of its postal service? Are the statutes passed for that purpose also invalid?" Whatever force the argument thus suggested may seem to have is more apparent than real. It is founded upon a failure to notice fundamental distinctions in the nature of criminal offences.

The grand and principal distinctions between right and wrong, between what is criminal and what is innocent, (and we mean the practical and existing distinctions, and not absolute or theoretical ones,) are not created by laws. They exist in the minds of men antecedently to formal government, and are indeed a preliminary condition to the organization of any political society. It is not possible that such a society should subsist, except where one part is under subjugation to the other, unless there is a general concurrence among its members in relation to these distinctions. Propinquity, common origin and mutual intercourse produce this concurrence, and at the same time generally determine the territorial limits of the political organization. The laws are, for the most part, merely a recognition of the moral opinions of the members of the State, and are designed to enforce conformity in conduct.

When the government of the United States was formed, with legislative and judicial powers, it must have been assumed that those powers would be exercised in accordance with the rules of morality — those distinctions between right and wrong — which obtained universally in the societies over which it was to extend. But, on the other hand, political societies have the power to create new distinctions between right and wrong, and thus to declare practices before regarded as innocent, or indifferent, to be criminal offences and to punish them as such. Every completely sovereign power is clothed with this function; but a government not completely sovereign may or may

not have it. The charter of its powers must be scrutinized in order to ascertain how far its authority in this direction extends.

Turning to the division of powers made by our Constitution between the States and the general government, we find, as its most distinctive feature, that certain enumerated powers were awarded to the latter, and all others reserved to the former. And among the powers so reserved most certainly that of determining what new things should be declared and treated as criminal offences against the good order of society was embraced, except so far as distinct powers of legislation upon particular subjects were conferred upon the general government.

There is, therefore, a well defined line which limits the extent to which the general government can act as a moral person, and regulate its powers so as to favor or disfavor particular acts of individuals in the States. That line is, in general, coincident with the boundary everywhere recognized as separating *mala prohibita* from *mala in se*. A *malum in se* is a thing absolutely evil in itself; not indeed absolutely in a philosophical sense, but absolutely according to the universal conviction in the political society which so views it; and *mala prohibita* are those things, otherwise indifferent or innocent, which the legislative power having control over the subject may declare to be offences. This distinction enables the government to exclude from the mails all matter promoting such acts as it has the authority to declare to be criminal offences and to punish as such; and also all matter promoting what were, at the time of the adoption of the Constitution (and possibly what in the progress and development of our society may come to be) universally regarded as *mala in se*, including all such crimes as murder, arson, burglary, larceny, etc. And in this latter class the offence of circulating obscene books and pictures undoubtedly falls. This was a well known offence at common law. Lord Campbell in *Dugdale's Case*, 1 Dearsly Crown Cas. 64, 75; Holt's Laws of Libel, 73.

The question then, is, "are lotteries and dealing with lotteries *mala in se?*" Upon this no argument need be employed. The common conviction of men has never so regarded them.

Universally allowed at the time of the adoption of the Constitution, and still allowed in some of the States, they can only be regarded as among that class of things which may be made *mala prohibita*. And so it has been declared in an authoritative decision of this court: *Stone* v. *Mississippi*, 101 U. S. 814, 821.

II. But the statute in question is invalid, not only for the reason that none of the powers conferred upon Congress were sufficient to authorize it, but also because Congress was by an express restriction upon the exercise of those powers, prohibited from making such a law. It is a law "abridging the freedom of the press" within the meaning of the First Amendment.

1. It is important to keep in mind throughout this discussion, that the constitutional safeguard thus invoked is not so much a limitation upon the express powers enumerated and granted to Congress, as it is a restriction upon the legislative means to be employed in the exercise of those powers. Speaking with precision, it is a restriction upon the incidental powers which Congress may exercise in carrying out its express powers.

2. Any discussion of the question, whether an enactment of Congress abridges the "Liberty of the Press," should properly start with a clear statement of what that phrase imports, or rather what it imported at the time of the adoption of the Federal Constitution, for it was the particular Liberty of the Press which then existed, which was, and is, protected by the constitutional safeguard.

3. Our proposition is, that this Liberty of the Press imported the liberty of free discussion in print, without any restraint, save that which was imposed by the law of libel as it then existed in the jurisprudence of England and her American Colonies.

After reviewing at length the struggle for freedom of the press, and for trial by jury in prosecutions for libel in England, for a century and a half, *Mr. Carter* continued:

The question is, in what sense the term "Liberty of the Press" was employed in the First Amendment. How can we doubt that the framers of the Constitution, themselves devoted

to free principles of government, detesting. the doctrines of arbitrary power, with the spectacle then actually before their eyes of the conflict going on in England between rival views — a struggle in which all who had been. their friends were upon the popular side — a. struggle substantially finished by the triumph of that side — intended. by the phrase "Liberty of the Press" precisely that liberty which was not only guarded by exemption from previous restraint, but defended by the safeguard of a jury. trial ?

The contemporaneous exposition by those principally instrumental in the framing of the Constitution is in entire accordance with the foregoing views. It is nowhere better expressed than in Hamilton's masterly brief in the celebrated case of *The People* v. *Croswell*,. an indictment for a libel upon Thomas Jefferson, President of the United States.. ·

" I. The liberty of the press consists in the right to publish with impunity truth, with good motives, for justifiable ends; though reflecting on government, magistracy or individuals.

" II. That the allowance of this right is essential to the preservation of free government — the disallowance of it fatal.

" III. That its abuse is to be guarded against by subjecting. the exercise of it to the animadversion and control of the tribunals of justice; but that this control cannot safely be entrusted to a permanent body of magistracy, and requires the effectual coöperation of court and jury.

" IV. That to confine the jury to the mere question of publication and the application of terms, without the right of inquiry into the intent or tendency, referring to. the court the exclusive right of pronouncing upon the construction, tendency and intent of the alleged libel, is calculated to render nugatory the. function of the jury, enabling the court to make a libel of any writing whatsoever, the most innocent or commendable.

" V. That it is the general rule of criminal law, that the intent constitutes the crime, and that it is equally a general rule that the intent, mind or *quo animo*, is an inference of fact to be drawn by the jury.

' " VI. That if there are exceptions to this rule they are con-

fined to cases in which not only the principal fact, but its circumstances, can be and are defined by statute, or judicial precedent.

"VII. That in respect to libel there is no such specific and precise definition of facts and circumstances to be found; that consequently it is difficult, if not impossible, to pronounce that any libel is, *per se* and exclusive of all circumstances, libellous; that its libellous character must depend upon intent and tendency, the one and the other being matters of fact."

This precise and elegant statement of the law was supported by a luminous argument reviewing the whole law of libel and its history, showing that it was the ancient law, and that Mr. Fox's act was declaratory merely. It received the full assent of Kent, afterwards Chancellor, whose opinion contains a most elaborate scrutiny of the doctrine of Lord Mansfield in *King* v. *Woodfall*, 20 State Trials, 895, and declares that he and the judges who followed him had "involved themselves in inconsistency and paradox; and I am induced to believe that it is a departure from the ancient, simple and true history of the trial by jury in criminal cases." Hamilton's Works, ed. 1886, vol. 7, p. 333; ed. 1851, vol. 7, p. 849; *People* v. *Croswell*, 3 Johns. Cas. 336, 365.

4. It may be assumed, therefore, that the phrase "freedom of the press," as employed in the First Amendment, imported that measure of liberty which permits, without previous restraint, the publication of any writing whatever, and without the restraint of any subsequent penalty, unless it should be found by a jury on a regular trial to be such a publication as the law then condemned as libellous. The immediate purpose and effect of the amendment was to place this great safeguard of liberty beyond the peril of the exercise even of the legislative power.

5. Having determined the import of the term "freedom of the press," as employed in the First Amendment, we are now prepared for the main inquiry whether the statute in question is a law abridging that freedom. That such is its character is very clear. That freedom includes not only the liberty of printing, but the liberty of publishing. The former would be empty

indeed without the latter. And the liberty of publishing must be coextensive with the liberty of printing. Publishing and circulating are admitted to be synonymous. *Ex parte Jackson, supra.* And what was the liberty of publishing, which existed at the time of the adoption of the Constitution? It was the liberty of circulating printed matter in all practicable and permissible forms, of which that by mail was by far the principal mode. It included letters, newspapers and packets.

Does the statute in question abridge the freedom of circulation? We make no effort to conceal the embarrassment which attends any discussion of this question since the decision of this court in *Ex parte Jackson,* 96 U. S. 727. That the statute was within the powers of Congress, aside from any express restriction, it would seem, was silently assumed, rather than considered and determined by that decision; but the point that it was invalidated by the restriction seems to have been made and passed upon. We cannot, however, but think that it was inadequately presented, and this court has not been in the habit of placing a vital question of constitutional law beyond the reach of agitation until its merits have been thoroughly discussed. The attention of the court is, most respectfully, but earnestly, solicited to the following considerations which seem to demonstrate that the statute does abridge the freedom of circulation, and, by consequence, the freedom of the press.

The meaning of the term "abridge" will surely not be disputed. It is not synonymous with destroy, deprive or take wholly away. It means to shorten, to curtail, to contract, to diminish. The principal, if not the only mode of circulating, at the time of the adoption of the Constitution, such printed matter as newspapers, pamphlets and circulars, was by mail. It has always been so, and must become more and more so as society advances. We submit it to candid minds to say whether the freedom of circulating printed matter, which is admitted to be synonymous with the freedom of the press, is shortened, curtailed, contracted, diminished or, in other words, abridged, when the natural, appropriate and principal means by which such matter may be circulated is absolutely taken away.

Under this statute no man can circulate a newspaper in any State except upon condition that he consents to forego the benefit to be derived from any such advertisement, although it may be entirely legal in such State. Of course the conditions may, if this be allowed, be extended to any other advertisement relating to any business or subject; and thus the power is directly asserted by this legislation of Congress to control the character of the whole newspaper press; for no one will pretend that the publication of newspapers is possible, on any large scale, if the benefit of the mail service is denied to them.

And still further: The statute creates a censorship. Had it forbidden only the depositing in the mail of the matter described, it might be urged that every one was at liberty to make such deposit, subject to the hazard of being indicted and punished, and, therefore, that there was no previous restraint. But the prohibition forbids the postmaster from delivering any such newspaper, circular, pamphlet or publication. It arrests publication, for it arrests the communication of the matter to the public, or to those for whom it is intended. And whether publication should be thus arrested is submitted to the judgment of a postmaster. This is a perfect restoration of the censorship.

It may possibly be suggested that the purpose of the act in question is not in any manner to impair or abridge free discussion of any question, but to break up a certain business or certain practices. If such suggestion is designed to show that the statute is limited, or should be construed to be limited, to such acts as are parts of some business transaction in relation to a lottery, it must be rejected. Whatever is fairly embraced within the language of the act must be deemed to have been intended by it. Courts cannot cut down the scope of an enactment as marked out by its language on the basis of a supposal that Congress must be deemed to have intended only what was constitutional and reasonable. This may be done when the language employed suggests a doubt, but is quite inadmissible where the doubt is whether the legislature has power to do what it has plainly attempted. Courts cannot legislate.

Mr. Carter's argument for Petitioner.

Our argument in no manner involves the consequence that the existing legislation of Congress, excluding obscene books and pictures from the mails, is invalid, as abridging the freedom of speech. It will be perceived upon referring to the observations concerning this legislation hereinbefore made, that the power and the duty of Congress to refrain from so exercising its express powers as to facilitate the commission of crime was distinctly admitted. What was denied was that Congress had the power to exclude matter as being criminal which was not criminal *per se*, which was not regarded as criminal at the time of the adoption of the Constitution, which was then permitted, if not encouraged, in most, if not all the colonies, was still permitted and protected in some of the States, and over which, as being criminal or innocent, Congress had no direct power whatever.

Our statute making the circulation by mail of such matter a penal offence, follows rigidly the principle which governs such indictments. There must be a jury trial, and the question whether the books or pictures are obscene — in other words, whether they are libellous — is always an issue of fact determinable by the jury alone. But if Congress had undertaken to describe and condemn particular books or publications as promotive of murder, arson or any other crime, or as being obscene, and make the circulation of those a penal offence, thus taking away from the jury the determination of the question of their guilty tendency, the prohibition contained in the First Amendment would have been distinctly violated. It is precisely here that the legislation under notice exhibits its vice. It leaves to no jury the power to determine whether any publication relating to a lottery — a remonstrance against them, an argument for them, an advertisement of them, any expression of views concerning them — is of evil design and tendency. If the matter relates to lotteries, proof of mailing is enough. All else is a question of law and the jury must convict.

III. It is very respectfully submitted that the consideration and decision of the questions herein discussed should not be embarrassed by the judgment in *Ex parte Jackson*, 96 U. S. 727. The question whether Congress could exercise a power

of excluding matter from the mails solely because of the sub-
ject to which it related, and not with any view of making the
service more practicable, convenient and useful seems not to
have been debated. Nor does the question seem to have been
debated whether Congress could employ an incidental power ·
in order to repress a business or practice within a State over
which it had under the Constitution no control. It seems. to
have been hastily assumed that, inasmuch as the regulation of
the whole postal system was lodged with Congress, any laws
passed by Congress in relation to that system must be deemed
to be regulation ; and that " the right to designate what should
be carried, necessarily involves the right to determine what
should be excluded." · Upon the question whether the law
abridged the freedom of the press the doctrine declared seems
open to much question, and induces the belief that it could not
have been adequately presented in argument.

*Mr. Assistant Attorney General Maury* opposing. ·

Unless the case of *Ex parte Jackson*, 96 U. S. 727, is to be
reversed, it is conceded that the writs prayed for in these peti-
tions must be denied. I shall aim to show that that decision
rests on sound principles of constitutional law.

The whole system of the transportation of the mails is built
upon the power to establish post-offices and post-roads. *Legal
Tender Cases*, 4 Wall. 457, 537. In the somewhat inadequate
language of the power, and in the studied reticence of the
Constitution in regard to it, we find an invitation to Congress
to use a wide discretion as to ways and means. Under this
power Congress has established a comprehensive postal service,
and enacted laws regulating it, one of which is section 3894 of
the Revised Statutes, as amended by the act of September 19,
1890, 26 Stat. 465, c. 908, which provides that no newspaper,
circular, pamphlet, etc., containing any advertisement of any
lottery shall be carried in the mail, or delivered by any post-
master or letter-carrier, and makes it a penal offence to deposit
such newspaper or publication in the mails for the purpose of
such transportation. Has Congress the power to make this
an offence ?

Mr. Maury's argument against the applications.

To determine this question we must look at the nature of the power. The test is laid down by Chief Justice Marshall: "Whenever the terms in which a power is granted to Con-gress, *or the nature of the power*, require that it should be exer-cised exclusively by Congress, the subject is as completely taken from the state legislatures, as if they had been expressly forbidden to act upon it." *Sturges* v. *Crowninshield*, 4 Wheat. 122, 193.

From the nature of this power, it is vested exclusively in Congress; for it belongs to a class, which, like the power to regulate commerce, to declare war, to establish a uniform rule of naturalization, and to establish uniform laws on the subject of bankruptcies, is as exclusively vested in the United States as if their exercise by the States had been forbidden. It follows, as a sequence of immense significance, that the States have denuded themselves of the power to prevent the introduction, by the mails, of things that endanger the morals or the health of their people.

Here, then, is an undoubted surrender by the States of a fragment of their police power; just as in *McCulloch* v. *Maryland*, 4 Wheat. 316, and *Brown* v. *Maryland*, 12 Wheat. 419, the States were held to have surrendered a fragment of the taxing power; and in *Leisy* v. *Hardin*, 135 U. S. 100, they were held to have lost a fragment of their police power.

It is equally clear that the police power which the States have thus surrendered has, by the Constitution, been devolved upon Congress. If it has not, then the Constitution has resulted in a failure of government in a vital particular, (and what graver necessity is there for the existence of a power, than the prevention of the failure of government?) or on the other hand, each State possesses a power within itself, which, by its very nature, should be uniform throughout all the States.

The assertion that power resides nowhere to prevent the transportation of such matter in the mails is somewhat appall-ing. The treaty making power has been assumed to be broad enough to exclude such matter from foreign mails: certainly the power to establish post-offices and post-roads should be equally broad as to the interstate mails.

There is a broad ground on which we may rest the implication that the Federal government has a police power over such subjects. No power in the Constitution can be exercised in such a way as to defeat any one or more of the five great purposes for which the Constitution was ordained, namely: (1) to form a more perfect union: (2) to establish justice: (3) to insure domestic tranquillity: (4) to provide for the common defence: (5) to promote the general welfare.

It is not contended that from each of these a substantive power can be evolved; but the whole instrument is subordinate to these leading objects. To establish a postal system without forbidding, under proper sanctions, its use for purposes hurtful to the morals of the people of the several States, would have been to endanger, instead of to promote, the general welfare. Not only so, it would have been to weaken the bonds of the Union, instead of making them more perfect, if Congress had not legislated in the way complained of. From this partial surrender of state police power, and the duty of Congress to promote the general welfare, it follows, by necessary implication, that Congress is clothed with all the police power over the mails that the several States would have had if the surrender had not been made.

This places Congress under an imperative duty to keep out of the mails everything that the representatives of the people in the several States, and of the States themselves, in Congress assembled, may properly exclude by a lawful use of police power. In *McCulloch's Case* the power implied to establish a bank was on the ground of convenience. Here, however, the power is absolutely necessary, to prevent a failure of government, the endangering of the general welfare and the weakening of the bonds of the Union itself. It is no exaggeration to say that such grave consequences would flow from permitting the lottery people of Louisiana to traffic in lottery tickets through public mails entering States where that traffic is prohibited as criminal.

We all know the disintegrating effect on the Union of the irritations growing out of slavery. Similar disintegrating forces would be the result of allowing the prostitution of the mails

to the Louisiana lottery. The people of the several States would be driven to exasperation by the impunity thus given to the lottery in defiance of their laws. With the mail at its service, the lottery could defy the police power of the States. Is there not, then, a direct connection between the law in question and the power "to establish post-offices and post-roads?" it being well established that what is necessarily implied in the Constitution is as much a part of it as what is expressed in it.

After what this court has said in *Phalen* v. *Virginia*, 8 How. 163, and in *Stone* v. *Mississippi*, 101 U. S. 814, there is no room for argument that if Congress has this police power over the mails, the exclusion of lotteries from them is within it. Louisiana has no more right to send the lottery infection in her newspapers through the mails than she has to send the yellow fever infection. The subject is a proper one to call into activity the police power of Congress.

The necessity for such a power has driven the other side to a concession which is a virtual surrender of the argument: that a lottery is not a *malum in se*, but that it is *malum quia prohibitum*, and that the police power of Congress is restricted to matters *mala in se*.

This gives up the case — not only because it cannot rest on such fanciful distinctions, but also because lotteries are clearly *mala in se*. *Phelan* v. *Virginia, ubi supra.*

Such an argument is an anachronism, even in Louisiana, whose legislature has from time to time denounced lotteries as crimes to be severely punished, making it "the duty of the presiding judge of every court of criminal jurisdiction in this State, especially to charge every grand jury to inquire into all violations of the laws against lotteries, and against the unlawful selling of tickets in lotteries." It is an anachronism, because it regards lotteries from the standpoint from which they were regarded when the Constitution was formed.

It is argued that nothing can be excluded from the mails by Congress that was not criminal *in se* when the Constitution was adopted. But this court trammels itself with no such restriction in determining the *bona fides* of an exercise of state police power. If the question in *Mugler* v. *Kansas*, 123 U. S.

·623, had been raised at a much earlier day it might have been decided differently. How short a time it is since the abolitionist and the prohibitionist were looked upon as crackbrained zealots. Times and the opinions of men have undergone a radical change. Slavery is abolished, and society is now wrestling with the liquor traffic as one of the monster evils of the day. Now a State may prohibit the manufacture of liquor, and destroy the property of the manufacturer, and this court holds that, in such a case, the manufacturer has received *no injury*; that he cannot complain that his property has been .taken without due process of law; that his damage cannot be redressed; that it is *damnum absque injuria.*

When the good faith of an exercise of the police power is assailed, this court does not go back to the formation of the Constitution for its standpoint.

To classify slavery and illicit liquor traffic now as mere *mala prohibita* would be absurd, as absurd as to contend that steamships cannot be used in the navy or that the mail must be transported overland on horseback or in a stagecoach. "There are few sources of crime," says this court in *Crowley* v. *Christiansen*, 137 U. S. 86, 91, "equal to the dram-shop, where intoxicating liquors, in small quantities, to be drunk at the time, are sold indiscriminately to all parties." No less condemnatory is its language about the lottery. "Experience has shown that the common forms of gambling are comparatively innocuous when placed in contrast with the widespread pestilence of lotteries. The former are confined to a few persons and places, but the latter infests the whole community; it enters every dwelling; it reaches every class; it preys upon the hard earnings of the poor and it plunders the ignorant and simple." *Phalen* v. *Virginia*, 8 How. 163, 168.

It is admitted that there may be an evolution in crime, and that *malum prohibitum* may become *malum in se.* Polygamy was a great advance from incest and indiscriminate commerce; but polygamy is now a crime. So gladiatorial shows, murder of the aged and helpless in nomadic tribes, political assassination, piracy, and other things which were once esteemed virtues, have become, under changed conditions, vices of the

darkest dye. As this court says in *Mormon Church* v. *United States*, 136 U. S. 1, 49, "No doubt the Thugs of India imagined that their belief in the right of assassination was a religious belief; but their thinking so did not make it so. The practice of suttee by the Hindu widows may have sprung from a supposed religious conviction. The offering of human sacrifices by our own ancestors in Britain was no doubt sanctioned by an equally conscientious impulse. But no one, on that account, would hesitate to brand these practices, now, as crimes against society, and obnoxious to condemnation and punishment by the civil authority."

It is precisely because the conditions are changed that we say the lottery is *malum in se;* and of these changed conditions this court, as we have already seen, takes notice.

But, it is said, if lotteries can be thus excluded from the mails, Congress may exclude anything on the pretext that it is hurtful, and in that way break down a legitimate business. This is the old argument against a power, because it may be abused. This court is a sufficient protection against an abuse of state police power; and if Congress shall abuse its police power over the mails, this court will, in like manner, correct that abuse. It will neither suffer a State or Congress to invade guaranteed rights under the guise of exercising a police power. This court regards substance, not form.

But, it is said, the freedom of the press is assailed by this legislation.

Does the constitutional guaranty of freedom of the press override the duty of Congress to purge the mails? This guaranty, in common with all other provisions, is subordinate to the great leading purposes for which the Constitution was ordained: one of which is, the promotion of the general welfare, and another, "to form a more perfect union."

Again, whether this guaranty is paramount or not, the denial of the mails is no abridgment of the freedom of the press. All other channels are left open; channels of commerce, railroads and newspaper trains. Freedom of the press, like freedom of speech, and "the right to keep and bear arms," admits of and requires regulation, which is the law of liberty

that prevents these rights from running into license. Thus in some places newspapers are not to be hawked about the streets; in others they are not to be cried on Sunday. Nobody thinks that the freedom of the press, guaranteed by the Constitution, is interfered with by such regulations.

But it is said there is censorship in the prohibition to the postmaster to deliver. The prohibition only relates to newspapers containing lottery *advertisements*. It may be filled with other matter touching lotteries, and the prohibition will not apply. And further, the postmaster is not the channel of publication prescribed by law. He is responsible, under the law, if he abuses his power. We are not to assume that an officer, whose duty it is to withhold newspapers containing lottery advertisements, is going to violate the law and convert himself into a censor. No government would be practicable on that theory.

Shall Louisiana dominate the Union with this lottery? Power to prevent it must exist somewhere. It does exist in the United States, the government of all, with powers delegated by all, and representing all. *McCulloch* v. *Maryland*, 4 Wheat. 316, 405. "Power to determine such questions, so as to bind all, must exist somewhere, else society will be at the mercy of the few, who, regarding only their own appetites or passions, may be willing to imperil the peace and security of the many, provided only they are permitted to do as they please. Under our system that power is lodged with the legislative branch of the government. It belongs to that department to exert what are known as the police powers of the State, and to determine, primarily, what measures are appropriate or needful for the protection of the public morals, the public health or the public safety." *Mugler* v. *Kansas*, 123 U. S. 623, 660.

MR. CHIEF JUSTICE FULLER delivered the opinion of the court.

We are constrained by the circumstances in which we find ourselves placed by the illness and death of Mr. Justice Brad-

ley, to whom the preparation of the opinion in these cases was committed, to waive any elaboration of our views, and confine ourselves to the expression of the general grounds on which our decision proceeds.

These are applications for discharge by writ of *habeas corpus* from arrest for alleged violations of an act of Congress, approved September 19, 1890, entitled " An act to amend certain sections of the Revised Statutes relating to lotteries, and for other purposes."ᵃ   26 Stat. 465, c. 908.

The question for determination relates to the constitutionality of section 3894 of the Revised Statutes as amended by that act.   In *Ex parte Jackson*, 96 U. S. 727, it was held that the power vested in Congress to establish post-offices and post-roads embraced the regulation of the entire postal system of the country, and that under it Congress may designate what may be carried in the mail and what excluded; that in excluding various articles from the mails the object of Congress is not to interfere with the freedom of the press or with any other rights of the people, but to refuse the facilities for the distribution of matter deemed injurious by Congress to the public morals; and that the transportation in any other way of matters excluded from the mails would not be forbidden. Unless we are prepared to overrule that decision, it is decisive of the question before us.

It is argued that in Jackson's case it was not urged that Congress had no power to exclude lottery matter from the mails; but it is conceded that the point of want of power was passed upon in the opinion.   This was necessarily so, for the real question was the existence of the power and not the defective exercise of it.   And it is a mistake to suppose that the conclusion there expressed was not arrived at without deliberate consideration.   It is insisted that the express powers of Congress are limited in their exercise to the objects for which they were entrusted, and that in order to justify Congress in exercising any incidental or implied powers to carry into effect its express authority, it must appear that there is some relation between the means employed and the legitimate end. This is true, but while the legitimate end of the exercise of the

power in question is to furnish mail facilities for the people of the United States, it is also true that mail facilities are not required to be furnished for every purpose.

The States before the Union was formed could establish post-offices and post-roads, and in doing so could bring into play the police power in the protection of their citizens from the use of the means so provided for purposes supposed to exert a demoralizing influence upon the people. When the power to establish post-offices and post-roads was surrendered to the Congress it was as a complete power, and the grant carried with it the right to exercise all the powers which made that power effective. It is not necessary that Congress should have the power to deal with crime or immorality within the States in order to maintain that it possesses the power to forbid the use of the mails in aid of the perpetration of crime or immorality.

The argument that there is a distinction between *mala prohibita* and *mala in se*, and that Congress might forbid the use of the mails in promotion of such acts as are universally regarded as *mala in se*, including all such crimes as murder, arson, burglary, etc., and the offence of circulating obscene books and papers, but cannot do so in respect of other matters which it might regard as criminal or immoral, but which it has no power itself to prohibit, involves a concession which is fatal to the contention of petitioners, since it would be for Congress to determine what are within and what without the rule; but we think there is no room for such a distinction here, and that it must be left to Congress in the exercise of a sound discretion to determine in what manner it will exercise the power it undoubtedly possesses.

We cannot regard the right to operate a lottery as a fundamental right infringed by the legislation in question; nor are we able to see that Congress can be held, in its enactment, to have abridged the freedom of the press. The circulation of newspapers is not prohibited, but the government declines itself to become an agent in the circulation of printed matter which it regards as injurious to the people. The freedom of communication is not abridged within the intent and meaning

of the constitutional provision unless Congress is absolutely destitute of any discretion as to what shall or shall not be carried in the mails, and compelled arbitrarily to assist in the dissemination of matters condemned by its judgment, through the governmental agencies which it controls. That power may be abused furnishes no ground for a denial of its existence, if government is to be maintained at all.

In short, we do not find sufficient grounds in the arguments of counsel, able and exhaustive as they have been, to induce us to change the views already expressed in the case to which we have referred. We adhere to the conclusion therein announced.

*The writs of habeas corpus prayed for will therefore be denied, and the rules hereinbefore entered discharged.*