### BOGY v. UNITED STATES.

### SPAULDING v. SAME.

#### Nos. 7616, 7649.

Circuit Court of Appeals, Sixth Circuit.
May 9, 1938.

Charles M. Bryan and Thomas L. Robinson, both of Memphis, Tenn. (Chas. M. Bryan and Blan R. Maxwell, both of Memphis, Tenn., on the brief for Bogy; Thomas L. Robinson and John E. Robinson,

both of Memphis, Tenn., on the brief for Spaulding), for appellants.

R. G. Draper, of Memphis, Tenn. (William McClanahan, C. P. J. Mooney, and R. G. Draper, all of Memphis, Tenn., on the brief), for appellee.

Before HICKS and ALLEN, Circuit Judges, and DRUFFEL, District Judge.

ALLEN, Circuit Judge.

The appellants were found guilty under six counts of an indictment, the first five counts of which charged them jointly with one Joseph R. DeLatte with violating the mail fraud statute, title 18, section 338, U. S.C. 18 U.S.C.A. § 338. The sixth count charged them with conspiracy to violate the mail fraud statute and section 77q, title 15, U.S.C. 15 U.S.C.A. § 77q. The District Court sentenced the appellants under each count.

The first count of the indictment, which by reference is incorporated into the other counts, in substance charges appellants, together with Joseph R. .DeLatte (who pleaded guilty), with devising a scheme, in violation of the above statutes, to defraud customers of the Colonial Investment Syndicate, Inc., of which Bogy is president and sole owner, of bonds which they had theretofore purchased from Bogy. It also charges appellants with using the mails for the purpose of fraudulently releasing Bogy from liability for. bonds purchased by his customers but not yet delivered to them by Bogy. The first two counts of the indictment are based upon letters mailed by Bogy to two of his customers, and the third, fourth and fifth counts are based upon letters mailed by three of Bogy's customers to Bogy, all charged to have been mailed for the purpose of executing the fraudulent scheme. The sixth count describes the alleged conspiracy and lists among other overt acts the mailing and receiving of the five letters embodied in the other counts, and the unlawful use of the mails in the sale of securities.

It is impossible properly to summarize the allegations in this involved and detailed indictment. For the purposes of this opinion it is sufficient to say that the gist of the fraudulent scheme set forth was as follows:

Bogy, a resident of Memphis, Tennessee, had built up a business in selling and exchanging securities. In his manipulations he was often unable to make prompt deliveries, and therefore owed bonds to certain customers. Having secured the necessary information from Bogy, Spaulding would acquire from Bogy's customers the bonds in their possession, would induce them to execute papers releasing Bogy from liability for the securities still owed (some of which papers were mailed), and would appropriate the bonds secured.

The appellants attack the sixth count of the indictment, both by demurrer and by assignment of error, upon the following grounds:

(1) That the facts set forth were insufficient to charge an offense.

(2) That section 77q, title 15, U.S.C., 15 U.S.C.A. § 77q, imposes punishment for fraudulent "sales" by use of the mails or instruments of interstate commerce, and that the indictment does not charge that a sale was actually made by such means.

(3) That section 77q, title 15, U.S.C., 15 U.S.C.A. § 77q, is unconstitutional.

We think the District Court correctly overruled the demurrers. As to the sufficiency of the indictment, we note that no motion was filed to make the indictment more definite and certain. The true test of the sufficiency of the indictment is "whether it contains the elements of the offense intended to be charged, 'and sufficiently apprises the defendant of what he must be prepared to meet, and, in case any other proceedings are taken against him for a similar offense, whether the record shows with accuracy to what extent he may plead a former acquittal or conviction.' Cochran and Sayre v. United States, 157 U.S. 286, 290, 15 S.Ct. 628, 39 L.Ed. 704; Rosen v. United States, 161 U.S. 29, 34, 16 S.Ct. 434, 480, 40 L.Ed. 606." Hagner v. United States, 285 U.S. 427, 431, 52 S.Ct. 417, 419, 76 L.Ed. 861. Applying this test, the sixth count sufficiently charges conspiracy under title 18, section 88, U.S.C., 18 U.S. C.A. § 88.

The second contention likewise is untenable. A "sale," under title 15, section 77b (3), 15 U.S.C.A. § 77b (3) includes "every contract of sale or disposition of, attempt or offer to dispose of, or solicitation of an offer to buy, a security or interest in a security, for value * * *." In the transactions described in the indictment, securities were disposed of, or their disposition was contracted for, and hence they are covered by the broad definition of the statute.

The attack upon the constitutionality of section 77q, title 15, U.S.C., 15 U.S.C.A. § 77q, must also fail. The section reads as follows:

"(a) It shall be unlawful for any person in the sale of any securities by the use of any means or instruments of transportation or communication in interstate commerce or by the use of the mails, directly or indirectly—

"(1) to employ any device, scheme, or artifice to defraud, or

"(2) to obtain money or property by means of any untrue statement of a material fact or any omission to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading, or

"(3) to engage in any transaction, practice, or course of business which operates or would operate as a fraud or deceit upon the purchaser. * * *"

The principal contention is that securities do not fall within the class of articles of interstate commerce which Congress has power to regulate, and that the prohibition of the use of the mails in fraudulent sales of securities is therefore unauthorized. A similar contention was raised as to the validity of the mail fraud statute, title 18, section 338, U.S.C., 18 U.S.C.A. § 338, in Badders v. United States, 240 U.S. 391, 36 S.Ct. 367, 60 L.Ed. 706. The court held that Congress may forbid the use of the mails in furtherance of a scheme that it regards as contrary to public policy, whether it can forbid the scheme or not. Cf. Public Clearing House v. Coyne, 194 U.S. 497, 24 S.Ct. 789, 48 L.Ed. 1092; In re Rapier, 143 U.S. 110, 12 S.Ct. 374, 36 L.Ed. 93; Ex parte Jackson, 96 U.S. 727, 24 L.Ed. 877.

We think these holdings by analogy support the validity of section 77q, title 15, U.S.C., 15 U.S.C.A. § 77q, Congress, under its power to establish post offices and post roads, Article 1, § 8, United States Constitution, has full control of the mails and may forbid their use in the execution of schemes to defraud. Under this section Congress has a similar power over the instrumentalities of interstate commerce. This power is complete in itself, and subject to no limitations except those found in the Constitution. Hipolite Egg Co. v. United States, 220 U.S. 45, 57, 31 S.Ct. 364, 55 L.Ed. 364. Section 77q is no more far-reaching than other statutes lawfully enacted to close the channels of interstate commerce to uses antagonistic to the public health and safety, such as the transportation of impure food (Hipolite Egg Co. v. United States, supra), the white slave traffic (Hoke .v. United States, 227 U.S. 308, 33 S.Ct. 281, 57 L.Ed. 523, 43 L.R.A.,N.S., 906, Ann.Cas.1913E, 905), and traffic in stolen automobiles (Brooks v. United States, 267 U.S. 432, 45 S.Ct. 345, 69 L.Ed. 699, 37 A.L.R. 1407). Congressional control of the mails logically includes the power to exclude therefrom not only articles physically dangerous to the public health, safety or welfare, such as narcotics, but also to forbid the use of the mails for deceptive transactions which are detrimental to the financial well-being of the nation. As said in Brooks v. United States, supra (page 346), "Congress can certainly regulate interstate commerce to the extent of forbidding and punishing the use of such commerce as an agency to promote immorality, dishonesty or the spread of any evil or harm to the people of other states from the state of origin." The particular statute here considered was held valid in Securities and Exchange Commission v. Torr, 15 F.Supp. 315, D.C.N.Y.; Jones v. Securities and Exchange Commission, 2 Cir., 79 F.2d 617.[1] Title 15, section 77q, U.S.C., 15 U.S.C.A. § 77q, is a valid exercise of the congressional power over the mails and interstate commerce.

Appellants also contend that the court should have directed a verdict for appellants, that the charge was prejudicially erroneous, and that misconduct of Government counsel prevented a fair trial.

Decision as to the court's denial of a directed verdict requires some statement of the evidence.

Bogy admitted buying the powers of attorney and sending the letters described above, but claimed that he had no connection with Spaulding. Spaulding admitted negotiating the deals, but said that the frauds were the conception of and were executed by Joseph R. DeLatte, co-defendant.

In the conduct of his business Bogy had acquired the confidence of the customers named in the indictment, Enochs, Miss Johnson, and Mrs. Kelly. He traded their securities and for that purpose retained them in his possession from time to time.

---

[1] This case was reversed on other grounds, 298 U.S. 1, 56 S.Ct. 654, 80 L.Ed. 1015.

Bogy had contracted to sell and during the early part of 1935 owed to Enochs, Mrs. Kelly and Miss Johnson some forty-seven bonds of the par value of $1,000 each, which were worth about twenty cents on the dollar, or about $9,000 in the aggregate, at the then market price. The fact that these bonds were selling so far below par had not been revealed to Mrs. Kelly or Miss Johnson by Bogy.[2]

In December, 1934, Bogy was pressed for funds. The bank account of his company ran as low as $24 in this month, and at no time during this period was adequate to pay for all of the bonds which Bogy owed. He kept no private bank account, having been through bankruptcy in 1930. Bogy considered that he had the right to sell certain bonds left in his possession "and put the money in the business," and it is plain that he had been operating to some extent on the proceeds of his customers' securities which had been left in his hands.

In each of the individual deals the same methods were employed. Spaulding called upon the customer, using a false name, either Deering or Moody, presented fictitious addresses and forged references, and induced the customer to "trade" the bonds he had and also to give to Spaulding a power of attorney or an assignment of the bonds due the customer from Bogy. In each case Spaulding dictated a letter which the customer signed and Spaulding mailed to Bogy, instructing Bogy to deliver to Spaulding the bonds still owed the customer.[3] The three letters of this description form the basis of the third, fourth and fifth counts of the indictment.

Spaulding then sent the assignment or power of attorney to Bogy by messenger, either R. A. DeLatte, Joseph R. DeLatte's brother, or S. P. Cummings, who also used fictitious names. Bogy delivered no bonds, but paid cash and received the power of attorney and assignment. Spaulding delivered none of the bonds contracted to be exchanged for those handed over by the customers.

The powers of attorney called for the delivery of securities valued roughly at about three times as much as the amounts Bogy paid. When the transactions were completed Bogy was released of all liability for the bonds owing to his customers, and Spaulding profited to the extent of Bogy's payment and whatever he retained from the sale of the converted securities acquired directly from the customers. In the same general way Spaulding acquired a substantial number of securities from other customers of Bogy and appropriated them.

In response to inquiries from Mrs. Kelly as to the reliability of Moody (one of the names assumed by Spaulding), Bogy answered that he knew nothing about him, although the address given was only one block distant from Bogy's office, and he could easily have made a personal investigation.

Letters were written by Bogy to Miss Johnson and Mrs. Kelly, telling of his delivery of the bonds to Spaulding.[4] These statements in the letters were false, as no such bonds were then in Bogy's possession.

The facts which afford ample support for the jury's verdict are as follows:

As to Spaulding: This appellant twice

---

[2] Enochs had died before the trial, and while the fraudulent appropriation of his bonds was shown, the surrounding circumstances could not be fully developed.

[3] A sample of this letter is the following:
"Dear Mr. Bogy:
"Will you please deliver to Mr. Walter A. Moody the eighteen Consolidated Gas and Electric Bonds (6% Gold Notes) you owe me. I have sold same to Mr. Moody, and received compensation therefor and this is your authority to deliver them to him.
"Yours very sincerely,
"[Signed.] Mrs. R. Ellis Kelly."

[4] The letter to Miss Johnson follows:
"Dear Miss Johnson:
"In accordance with your letter of March 26th, we made delivery yesterday to Walter A. Moody of the ten Consolidated Electric and Gas Company Bonds which we were holding for your account and received from him the Power of Attorney signed by you, and also his receipt for the Bonds.

"This, as stated before, completes all contracts with you, with the exception of one, only, Rocky Mountain Fuel Company Bond in the principal sum of $500.00, which will go forward to you within the next day or so.

"We trust that you have made a satisfactory and profitable trade for your Consolidated Bonds, and if we can serve you at any time, do not hesitate to let us know.

"With best wishes, we are,
"Yours very truly,
"Colonial Investment Syndicate, Inc.,
"[Signed] B. A. Bogy,
"By B. A. Bogy, President."

made extensive written confessions admitting his guilt. He repudiated these confessions when he testified at the trial, denied that he knew of the fraud until toward the close of the transactions, and claimed that Joseph R. DeLatte had induced him to enter the deal, had made all plans, and had received all profits except small commissions paid to himself.

Spaulding is clearly contradicted not only by his two confessions, but also by his admitted conduct during this period. He used five assumed names. He caused Enochs to sign papers, including the letter to Bogy, and dictated similar letters and papers for Miss Johnson and Mrs. Kelly to sign. All of the letters he mailed to Bogy. Spaulding's claim that he was simply a messenger for Joseph R. DeLatte is contradicted by Dych, who sold the bonds Spaulding appropriated. Dych, who had no knowledge of or connection with the fraud, states that on his arrival in Chattanooga with Joseph DeLatte, Spaulding had in his possession the bag of securities. Later Spaulding told Dych "I have just made $1,000.00." This statement was made after the Kelly deal, in which $1,000 was the amount paid by Bogy to Spaulding's agent.

The truth of Spaulding's confessions was strongly corroborated, and his motion for directed verdict was rightly denied.

As to Bogy: Each customer defrauded was a client of Bogy. While Spaulding denies that Bogy received any profit, Bogy owed bonds to these three customers, and was released from liability thereunder by these transactions. In each case the deal was not closed until Bogy was released. The letters mailed to Bogy authorizing Bogy to deliver the bonds to Spaulding were unnecessary from Spaulding's standpoint, since he had the power of attorney, but they were clearly calculated completely to disassociate Bogy from the conspiracy.

Other customers of Bogy were defrauded of numerous valuable bonds by Spaulding. Also Bogy sent word to Spaulding by R. A. DeLatte that Bogy wanted to send Spaulding "Some more—some names." A list of Bogy's customers was sent to Spaulding from Bogy's office. Bogy denies this, but R. A. DeLatte is corroborated in this by Spaulding and Joseph DeLatte. The list is in evidence, and reads as follows:

"J. W. Blair   Huntingdon
26M 8M due
D. S. Parker   Jackson
2M Metropolitans
12M other kinds
Mrs. G. E. Mayfield   Medina
2M Mets and quantity others
H. W. Key   Spring Creek, Tenn.
4M 2M due"

The list, written on Bogy's typewriter, so far as it went was correct. Blair and Key, for example, had bought from Bogy and had in their possession the number of bonds stated and the number given as owing from Bogy was then owing to Blair and Key respectively. The list when originally delivered had contained other names, and as each customer was approached and the transaction was made, that customer's name was torn from the series. The fact that the list contained data as to bonds owed by Bogy and not yet delivered demonstrates that the information came through Bogy, as the number of bonds undelivered could only have been figured in Bogy's office.

When Mrs. Kelly sought Bogy's advice as to the trade offered her by Spaulding, Bogy told her that the bonds offered by Spaulding were all good bonds, although he claimed not to know who Spaulding was, and doubted whether such a trade could be made. Mrs. Kelly says that Bogy said "If I could make such a trade as that I would make it without any hesitation whatsoever."

Bogy paid Spaulding $1,000 in the Enochs deal, $1,000 in the Kelly deal, and $750 in the Johnson deal; that is, he paid $2,750 for powers of attorney to release himself from liability for more than $9,000 worth of bonds at the then market price. Considered as settlement for the bonds or as a purchase of the powers of attorney, the price paid by Bogy was not commensurate with the value received. It was far more consistent with the existence of an agreement on his part to share the profits with Spaulding.

Bogy's statement as to the Enochs bonds is that he delivered seven of them to R. A. DeLatte for Spaulding, and bought seven himself, giving $1,000 and 400 shares of Television stock in payment. He is corroborated by no witness and by no record of any Television stock transaction. R. A. DeLatte says Bogy gave him $1,000 at this time, and denies receiving anything else.

A company check for $1,000 executed by Bogy on this day, endorsed by R. A. De-Latte under his assumed name, is in evidence.

As to the Kelly bonds, Bogy states that he put $3,700 cash into an envelope and gave it to Cummings (whom he had never seen before). He drew a company check for $1,000 on this day. This is the transaction in which Spaulding told Dych that he had just made $1,000. Bogy explains the $1,000 check as being a payment to a Mr. Johnson, who was not produced as a witness.

For the Johnson bonds, Bogy states that he paid $2,100 cash, but R. A. DeLatte says he received $750. A company check for $750 was drawn by Bogy on this day, and is explained by Bogy as having been paid to another purchaser who was not called to testify.

The admitted falsity of the letters written by Bogy to Mrs. Kelly and Miss Johnson, saying that he had delivered their bonds, does not serve to strengthen his uncorroborated assertions. Also the conduct of Bogy's business during this period was unsystematic, and he was unable to substantiate many of his material statements as to these transactions by orderly books or records. In fact Bogy said that only a pencil memorandum was kept of the bonds involved in the Enochs, Kelly and Johnson transactions, and that that "would not be absolutely accurate."

Bearing in mind the rule that on motion for directed verdict the evidence must be considered in the light most favorable to the party against whom it is urged (Nieman v. Aetna Life Ins. Co., 6 Cir., 83 F.2d 753), and that if substantial evidence be introduced sufficient to take the case to the jury no amount of contradictory evidence will authorize the trial court to direct a verdict (Great Atlantic & Pacific Tea Co. v. Chapman, 6 Cir., 72 F.2d 112), we conclude that the District Court correctly overruled the motion for directed verdict on behalf of Bogy.

■ The principal assignment of error to the charge arises out of the fact that the letters forming the basis of the first five counts were sent after the bonds in the possession of each customer and the power of attorney had been delivered to Spaulding. Appellants contend that each individual fraud was then complete, and that the sending of these letters had no connection with the scheme alleged in the indictment, and that the court should therefore have charged the jury that appellants were not guilty of using the mails to defraud or of conspiracy as charged. But the record clearly discloses that part of the fraudulent scheme was that Bogy should be released from liability for the bonds owed to these customers. This is the explanation for the letters which Spaulding caused Enochs, Mrs. Kelly and Miss Johnson to mail to Bogy, authorizing the delivery of the bonds. The powers of attorney given to Spaulding were sufficient for Spaulding's purpose, but not for Bogy's purpose, which was not only to profit by, but also to be exonerated from, any part in the scheme. Each individual transaction was completed only when Bogy received the letter and took up the power of attorney or assignment. Hence each letter sent by the customer was mailed in furtherance of a plan not yet consummated. The letters from Bogy were calculated to aid in the retention of the fruits of the fraud, to lull the victims into a false sense of security, to postpone their taking action with respect to their loss, and to delay discovery. Cf. Preeman v. United States, 7 Cir., 244 F. 1. The fact that letters were sent by Bogy after he took up each power of·attorney does not ·exonerate him, because the mails were used for the purpose of assuring the victim that he had not been defrauded, and attempting to lull him into inaction. Preeman v. United States, supra; Lewis v. United States, 9 Cir., 38 F.2d 406; Newingham v. United States, 3 Cir., 4 F.2d 490, 491. The enterprise was in the course of execution, both before and after the mails were used, and the letters tended to contribute to subsequent frauds which were incidents in the general scheme. Preeman v. United States, supra. The numerous requests to charge which fall within this group were rightly refused.

■ Other assignments to the charge may be dealt with summarily. It is not necessary that the scheme to defraud was intended to be executed by the use of the mails nor that any of the defendants at the time that they entered the common scheme so intended. If in the execution of the scheme the mails are in fact used, the statute is violated. Preeman v. United States, supra. The mere incidental and unpremeditated use of the mails in an attempt to defraud may give the federal courts jurisdiction. Hendrey v. United States, 6 Cir., 233 F. 5; Silkworth v. United

States, 2 Cir., 10 F.2d 711; United States v. Young, 232 U.S. 155, 161, 34 S.Ct. 303, 58 L.Ed. 548.

■ The contention that Bogy, if he entered the scheme, entered it after the mailing of the letters from the customers, and that the District Court therefore should have charged that Bogy was not guilty, has no merit. It need hardly be repeated that all who with criminal intent join themselves even slightly to the principal scheme, are subject to the statute, although they were not parties to the scheme at its inception (Kaplan v. United States, 2 Cir., 18 F.2d 939), the acts of one in furtherance of a common criminal enterprise being in law the acts of all. Sasser v. United States, 5 Cir., 29 F.2d 76; Belt v. United States, 5 Cir., 73 F.2d 888.

■ No reversible error appears in the charge, and we next consider the alleged misconduct of counsel. Appellant Bogy claims that counsel for the Government attempted to create class prejudice by holding Bogy up as a representative of city clubmen before a rural jury, and to foster sympathy by emphasizing the age of the persons victimized and the extent and nature of their loss. These contentions have no weight. Bogy himself testified as to his high social position, and many questions asked by the Government on this point were called forth by Bogy's testimony. Enochs was 82, Miss Johnson was 75, and Mrs. Kelly was of middle age. Evidence as to their age and condition was relevant. While counsel for the Government was at times over-zealous in his emphasis, he was in every such instance rebuked at the time by the trial judge. The test laid down by this court is that the inquiry as to misconduct of counsel "must always be as to whether in view of the whole record the impression conveyed to the minds of the jurors by irrelevant and prejudicial matter is such that the court may fairly say that it has not been successfully eradicated by the rulings of the trial judge, his admonition to counsel, and his instruction to the jurors to disregard it." Pierce v. United States, 6 Cir., 86 F.2d 949, 952; Volkmor v. United States, 6 Cir., 13 F.2d 594.

Applying this rule, we find that the rights of the appellants were protected and the trial was fair.

■ Appellants also attack the severity of the sentences imposed. The sentences are within the statutory limit, and hence we do not review the discretion vested in and exercised by the trial court in imposing them. Beckett v. United States, 6 Cir., 84 F.2d 731, 733.

The judgments are affirmed.