## GIORDANO et al. v. UNITED STATES.

(Circuit Court of Appeals, Second Circuit. November 20, 1925.)

No. 51.

**1. Criminal law ⟵422(1)—Evidence of acts and declarations of party to conspiracy to violate Immigration Law competent as against another.**

Evidence of acts and declarations of party to conspiracy to violate law regulating immigration of aliens, in carrying or attempting to carry into effect conspiracy, *held* competent as against another conspirator.

**2. Criminal law ⟵425—Testimony as to what party to conspiracy told witness as to being taken to Canada and smuggled back held admissible.**

In prosecution for conspiracy to violate law regulating immigration, testimony of witness that one of parties to conspiracy had told him he had given money to accused for purpose of being taken to Canada and smuggled back into United States *held* admissible.

**3. Criminal law ⟵424(1)—Evidence of payment of money in April inadmissible in prosecution for conspiracy ending in March.**

Where conspiracy to violate law regulating immigration of aliens was terminated in March by return of aliens from Canada, testimony as to repayment in April of money paid to accused by another alien for same purpose, and defendant's declarations in connection therewith, *held* inadmissible, as not being connected with conspiracy charged.

**4. Criminal law ⟵1169(1)—Admission of irrelevant evidence held not to have affected verdict.**

Admission of irrelevant testimony as to transaction with accused in April, as not being connected with conspiracy charged as ending in March, *held,* in view of other evidence, not to have affected verdict.

**5. Criminal law ⬤➙1169(2)—Judgment will not be reversed because of erroneous admission of evidence where legal evidence abundantly establishes case.**

A judgment will not be reversed because of erroneous admission of evidence, where the legal evidence abundantly establishes the case, or where it is apparent that the verdict would or must have been the same, had the evidence not been admitted.

Manton, Circuit Judge, dissenting.

In Error to the District Court of the United States for the Southern District of New York.

Philip Giordano and another were convicted of having conspired to violate section 8 of Act Cong. Feb. 5, 1917 (Comp. St. 1918, Comp. St. Ann. Supp. 1919, § 4289¼dd), and they bring error. Affirmed.

The plaintiffs in error were defendants below and are hereinafter referred to as defendants. They were indicted with seven others, and those of the seven who had been apprehended and were present at the trial pleaded guilty. The two defendants who went to trial were found guilty, with a recommendation of mercy, in each case. Philip Giordano was sentenced to pay a fine of $5,000 and to be imprisoned at Atlanta for one year and a day. Alfred Giordano was sentenced to pay a fine of $1,000 and to be imprisoned in the Essex county jail, at Newark, N. J., for 90 days.

The indictment charged the defendants, and those indicted with them, with having conspired to violate section 8 of the Act of Congress approved February 5, 1917 (Comp. St. 1918, Comp. St. Ann. Supp. 1919, § 4289¼dd), regulating immigration of aliens to, and residence of aliens in, the United States. The conspiracy charged was that the two defendants who have brought the case into this court conspired to bring into the United States the other defendants, who were indicted with them and who were aliens, being natives and citizens of Italy; none of them being lawfully entitled to enter or reside in the United States as these two defendants well knew. The aliens had entered the United States at Key West, Fla., without having been admitted, or examined, or inspected by an immigrant inspector, and all of them had been ordered deported from the United States by the Secretary of Labor.

The indictment charged, in furtherance of the conspiracy, that the seven other defendants met at the home of a certain person named in the indictment and in the Southern district of New York; that in furtherance of the conspiracy and to effect its object the seven other defendants applied to the Italian consul at New York City for passports to leave the United States; and that in furtherance of the conspiracy one of the seven, on a day specified and within the Southern district of New York, gave to the defendant Philip Giordano the sum of $500.

The propositions which the government alleged and undertook to prove were (1) that the aliens had been ordered deported from the United States by the Secretary of Labor; (2) that the defendants knew of this; (3) that Philip Giordano assured the aliens that they could go to Canada, stay there a few days, and return to this country; (4) that Philip Giordano received a considerable sum of money from the aliens for assisting them to carry out this ruse of entering Canada with the purpose of returning shortly thereafter to the United States; (5) that Alfred Giordano accompanied the aliens to Canada, and also accompanied them on their return thence to the United States.

Matthew T. Abrusso, of Brooklyn, N. Y. (Vine H. Smith, of New York City, of counsel), for plaintiffs in error.

Emory R. Buckner, U. S. Atty., of New York City (William J. Millard, Asst. U. S. Atty., of New York City, of counsel), for the United States.

Before ROGERS, MANTON, and HAND, Circuit Judges.

ROGERS, Circuit Judge (after stating the facts as above). The defendants ask to have the judgments against them reversed, and they assign 16 errors which they think were committed at the trial. Some of these alleged errors were not urged at the argument, and those of them which were urged, and which we think of sufficient importance to merit consideration, we shall pass upon.

The last of the errors assigned, and one which was urged at the argument, we shall consider first. It is said that the trial judge throughout the trial exercised his discretionary powers in a manner that was arbitrary and prejudicial to the defendants, "by putting suggestive and leading questions to the government's witnesses, by restating and enlarging the import of testimony given by witnesses for the government and by commenting unfavorably and without justification upon questions put and testimony elicited by defendant's counsel." Nevertheless, in the brief submitted to this court, counsel say: "We, of course, admit that not only did the learned trial judge intend to be

scrupulously impartial, but also that the record shows that such was his intention." Counsel, however, think that the record discloses "such a degree of bias in the judge's comments upon the evidence and in his treatment of counsel as was certain to prejudice the jury, and to prevent the impartial consideration by the jurors of the questions of credibility upon which the case necessarily turned."

We have read the charge to the jury with care. It was in all respects absolutely fair. The judge might have expressed his own opinion as to the guilt of the defendants, if he had instructed them that they were not bound by any opinion he entertained on that subject, but he scrupulously refrained from indicating in the slightest manner what his own opinion was, or whether he had any opinion on the subject. Only one exception was taken to the charge. It was to a refusal to charge in the manner requested, and the refusal was because the subject had been already fully covered by the charge; and we find no reference to the matter in the assignments of error. If error had been assigned, we should not hesitate to disregard it. We have examined the record with care, and we find nothing in it to indicate the bias and the prejudice to the defendants, or to their counsel, which warrants the conclusion that the defendants by the conduct of the judge were deprived of the fair and impartial trial to which they were entitled under the Constitution of the United States.

The evidence discloses that the seven defendants, before referred to, left Italy on October 12, 1922, and they landed in Cuba. From there they went to Key West, in Florida, without passports to enter the United States. At Key West they were arrested and gave bonds for their appearance in New York for examination. They proceeded to New York City, where they met relatives and friends. Among those they met was one Di Salvo. He is engaged in the real estate business in New York City. He had known two of the seven aliens in Italy, and they came here from the same town he did. On their arrival in New York, they went to Di Salvo's place of business, and explained to him their troubles in Cuba and Key West, and asked his help to save them, if possible, from being deported to Italy. Di Salvo interested Philip Giordano, one of the appellant defendants. He explained to him the situation in which these Italians found themselves. Giordano was 35 years old, and had been in this country 19 years. He is the publisher of an Italian daily newspaper, a graduate of an Italian University holding a degree in chemistry, and was regarded as having some political influence, at one time being president of the Italian National Republican League; and his testimony shows that he was known to the officials in the Department of Labor at Washington. Witnesses testified at the trial that his reputation for honesty and truthfulness was very good. Among those so testifying was a judge of the Court of Special Sessions of the city of New York, as well as a justice of the Supreme Court of the state of New York. Di Salvo testifies that Philip Giordano told him he would try and help these aliens out of their difficulties, and told him that he was to be in Washington on a certain day and asked him to meet him there. Di Salvo met him as agreed upon, and Giordano took him to the Department of Labor and showed him the files of the department, and that the aliens had been ordered deported, and that nothing could be done. Di Salvo testifies that a week later he again met Giordano in New York and told him that the aliens were willing to go to Mexico, if they could save themselves from being deported; that Giordano told him he would try to send them to Canada, but, if they wanted to go there, it would cost them for all seven $2,000. Di Salvo says he explained the situation to the aliens, and they stated that they were willing to go to Canada, if that would save them from being deported. The money was raised, and Mastrogiacomo, a brother of one of the seven indicted aliens, accompanied by Di Salvo, took the money to Philip Giordano's residence and left it there for him with his father—Giordano being at the time absent. Later Di Salvo stated he met Giordano himself, who told him that the $2,000 was not enough, and that it would be necessary to have more money. And it appears that each of the seven paid the additional money, and that it was paid to Giordano's father. Philip Giordano, according to Di Salvo, explained that the aliens could go to Montreal, Canada, and come back to the United States in a few days. The seven aliens thereafter, by direction of Philip Giordano, went to the Italian consul, and obtained their passports for Canada. They were accompanied to Canada by Alfred Giordano, one of the appellants, and a younger brother of Philip Giordano, and who two days later came back with them to the United States.

The testimony was that Alfred Giordano told the immigration inspector at Canada that his name was C. Morasco, that he was

a lawyer, and that he was taking the seven Italians into Canada to purchase jointly a farm, and that they intended to remain there and engage in farming. He also represented that the aliens had been in the United States several years, having entered in 1910 and 1911. The Canadian inspector passed them into Canada, but directed them to report to him at the end of two days regarding their progress in purchasing a farm. Two days later the Canadian inspector and the United States inspector found Alfred Giordano and the seven Italians on a train returning to the United States. Alfred Giordano informed the United States inspector that he was a lawyer from New York City by the name of C. Morasco, and represented the aliens, and they were returning from Montreal where they had gone to purchase a shoe business, and that they had been in the United States from eight to ten years.

Di Salvo testified that, after he returned to New York from Washington, he had an interview with Philip Giordano, and was told by him that he would try to send the aliens to Canada. The following is an excerpt from his testimony:

"Q. Now, tell the jury what happened next. A. Then, if they want to go to Canada, they can go at their own expense, but it would cost them $2,000 for all seven.

"Q. This is a conversation had with Philip Giordano and you? A. Mr. Philip Giordano and Antonio Mastrogiacomo. * * *

"Q. What was done next? A. Then those people, they go together, the aliens; they go and get that $2,000 ready. * * *

"Q. You had a conversation with Philip Giordano after that? A. He told me that the $2,000 was not enough, and it would cost them $500 each.

"Q. Philip Giordano told you? A. Philip Giordano told me; I went then and reported all that to these aliens, and they agreed to pay the $500 each.

"Q. Did you ask Philip Giordano whether or not he received $2,000 when you spoke to him? * * *

"Q. Did you ask Mr. Giordano? A. He told me the $2,000 was not enough, and they had to pay the balance.

"Q. Listen to my question. Did you ask him if he received $2,000 that you gave Vincent Giordano? A. I didn't ask him anything, but he told me that the $2,000 he had was not enough."

Angelo Mielle testified to a visit he paid to Philip Giordano at the latter's house in the interest of these Italians. The following is an excerpt from his testimony:

"What did he [Philip Giordano] say? A. First he said, 'What do you fellows come up here for? What are you fellows here for?' 'We are here to decide what we are going to do with these men.' I said, 'I got to advance $500 of my money, and I am afraid of this man running away and I got to pay.' He said, 'I am ready for it as soon as you pay my money.' Then I said, 'At first you got $2,000, I understand Di Salvo gave you $2,000; that was enough money.' Then he said, 'No; that ain't enough money, because I had to pay more money to Washington. I was just come from Washington last night, and I got to pay more money. They need more money. They got to go to Canada and come back.' I said, 'That is too much money.' I said to Antonio Mastrogiacomo, 'That is too much money for this man.' I said, 'Might as well let that go and we will hold our bonds to the government, and let the government decide what they are going to do, send them back to Italy or remain here.' So Antonio Mastrogiacomo said, 'No, what for?' He said, 'We had better pay a little more money than it is to do what they are going to do.' So we went up to Joe Di Salvo and report the same night with all six immigrants. I say—first I said, 'No; don't do it, that cost too much money.' So all together then they said, 'We are willing for all the money and we want to stay ourselves.'

"Q. Why did they want to pay all the money? A. To save themselves to remain in the United States. So in the same evening we make arrangement what time we will bring the amount up to Mr. Giordano's house. Mr. Giordano said, 'Come around, say half past 8 or 9 o'clock.'

"Q. At his house? A. At his house.

"Q. The following day, the next day? A. The next day.

"Q. Did you go around the next day? A. Yes, sure; the same morning.

"Q. Did you give the money—was the money given in your presence? A. There was the money given in my presence."

He went on to state that the next morning he and Antonio Mastrogiacomo and the seven Italians met Philip Giordano at his house, and that the latter said the plan was to take the men to Canada and then bring them back. Mielle asked him: "How are you going to get there and back?" He said: "This is our business."

The immigration inspector for the Canadian government testified that on March 11, 1923, he found these seven aliens on a Delaware & Hudson train on their way

to Montreal, and with them was Alfred Giordano, one of the defendants. This is an extract from his testimony:

"Q. Just tell us now what was said— what your examination consisted of. A During the examination of that train, I found seven aliens and another gentleman, who gave his name as C. Morasco, a lawyer of New York City.

"Q. You see that man now? A. Yes; in the second chair there (indicating).

"Q. The second man, the same man you identified before? A. The same gentleman.

"Q. Alfred Giordano? A. He gave his name as Morasco, and told me he was bringing these seven aliens to Canada to purchase a farm, joint farm, a large farm, and that they would remain there and engage in farming. I escorted the seven aliens and the gentleman who gave his name as Morasco to our immigration office in Montreal, where I made a manifest of each of the seven Italians. I told them that they could remain there for two days, except Mr. Morasco, who represented himself to be a lawyer, and at the expiration of that time they would report to me as to what their progress in purchasing this farm was. Two days later, while returning from Montreal to the States, I was called into the Pullman car on the morning train and asked by Inspector Yale, of the United States Immigration Service, if I could identify these men."

He was very positive in his identification of the defendant Alfred Giordano as being with the men and representing himself as a lawyer. His testimony was:

"Q. You could not be mistaken as to your identity, could you? A. Not in the slightest.

"Q. Positive of it? A. Positive.

"Q. Did you see him several times while he was there? A. Yes; we went to breakfast together, and after that I escorted him— I showed him, and we went to the Plaza Hotel, Montreal.

"Q. So you are certain it is the man? A. I was with him for probably two or three hours that morning."

The immigration inspector for the United States discovered these men in a Pullman car returning to the United States two days after their entry into Canada. He also identified Alfred Giordano. They were on a Delaware & Hudson train, coming out from Montreal. His testimony was:

"Q. Did you have a conversation with any of them? A. Yes, sir.

"Q. With whom? A. I was in charge as train inspector coming out from Montreal to Rouse's Point. I went through the two coaches and then into the parlor car. Upon arrival in the parlor car I met him—inspected him—this gentleman there (indicating), which he presented with a card by the name of C. Morasco. He said he was an attorney from New York, representing seven Italians that were riding in the parlor car. * * *

"Q. What was said? A. He said that these Italians were returning from Montreal; that they went to Montreal on the morning of the 11th to purchase some business up there. He represented to me as the business—in the shoe business.

"Q. Yes. A. I asked him how long they had been in the country; he said all the way from eight to ten years, living at New York, Hoboken, and Jersey City. I asked them if they had their Italian passports, and went to each one, and they had Italian passports.

"Q. Did the passports corroborate the statement that they were in the country as a matter of fact for these various numbers of years? A. Yes.

"Q. And you permitted them to come in? A. I permitted them to return to the United States, if they were legally admitted to the United States in the first place. Mr. Atkinson was on the same train. I went and got Mr. Atkinson (the Canadian inspector) to come into the parlor car with me to identify the same Italians he admitted on the morning of the 11th.

"Q. Did he identify them? A. He identified them.

"Q. Did he identify the man who accompanied them on the train as the man who accompanied them on the way in? A. Yes, sir."

Guiseppe Di Guglielmo, who was one of those indicted with the Giordanos, and who pleaded guilty, testified at the trial. His story was that he and the six Italians who came over with him, after they reached New York, went to see Giordano. The following are excerpts from his testimony:

"Q. What was said? A. He asked me if I have any papers with me, a passport or something, and I say, 'No.' He said, 'What are you going to do?' He says we will have to pay for it, and he will get it for me.

"Q. What else, if anything, was said? A. So he told him, 'If you will make me a passport, I will pay you money.'

"Q. What else was said? A. He asked me for money first, and I said as soon as you get me a passport I will give you the money.

"Q. Did you give him the money? A. No; I didn't give him no money. * * *

"Q. When did you see Mr. Giordano again? A. I have seen Mr. Giordano a few days later. * * *

"Q. Did you give Mastrogiacomo any money? A. Yes, sir.

"Q. How much? A. $285.

"Q. For what purpose did you give him money?

"Mr. Abrusso: Objected to as incompetent, irrelevant and immaterial, and not binding on the defendant Giordano.

"The Court: The objection will be sustained.

"Q. Was anything said about money when you saw Giordano this first time? A. Sure, yes.

"Q. What was said? A. Giordano told us that he wants $2,000 for the seven people.

"Q. Which Giordano? (Witness indicates.)

"Mr. Cotter: Indicating Philip Giordano.

"Q. For seven people he was to get $2,000? A. Yes, sir.

"Q. After that you gave $285 to Mastrogiacomo? A. Yes, sir.

"Q. When did you see Giordano next? A. Three or four days later I seen him again.

"Q. Where? A. In his office. * * *

"Q. What was said on that occasion by any of those persons? A. He says that he wants another $215 for one of us.

"Q. For each one? A. For each one.

"Q. What did you do after you learned that? A. We gave them the money, to be sure about it, that we would stay.

"Q. What is that? A. We will be sure we will remain here.

"Q. In the United States? A. Yes, sir. * * *

"Q. Did you give $215 extra? A. Yes, sir.

"Q. To whom? A. I paid $215 to a brother of the father.

"Q. The father of Giordano? A. Yes; the father of Giordano.

"Q. Were any of these two men here, Philip or Alfred, present at the time? A. Yes, sir.

"Q. Which one or both? A. The second; Philip was the name.

"Q. Alfred? A. Yes.

"The Court: Which was it—the second one, or Philip?

"Mr. Abrusso: The second.

"The Court: Does he say the second?

"The Interpreter: Yes, your honor.

"Q. After you gave the money, what happened? A. After we gave the money I went to Canada.

"Q. Who went with you? A. Alfred went with me, the brother of Giordano.

"Q. This man here (indicating)? A. Yes.

"Q. How long did you remain in Canada? A. Two days.

"Q. What did you do then? A. I came back over here.

"Q. With whom? A. The same, with the brother of Giordano.

"Q. The six other aliens and Alfred Giordano returned with you? A. Yes, sir * * *

"Q. When did you next see Giordano after you paid the $2,000? A. Five or six days later.

"Q. Was anything said about paying anything additional at that time? A. He said he wanted some more money.

"Q. How much more? A. He wants $500 for one more.

"Q. Apiece? A. Apiece.

"Q. Did you give the additional money? A. Yes; I paid afterwards another $215.

"Q. That made $500 in all? A. Yes, sir.

"Q. And it was after that you went to Canada? A. Yes, sir."

On his cross-examination he testified:

"Q. Did you have your own money? A. Yes; my cousin gave me this money.

"Q. What cousin gave it to you? A. Joseph Cianculli.

"Q. Did he loan it to you? A. Yes, sir.

"Q. How much did you have of this $500 of your own money? A. I did not have nothing; he gave me the money."

Joseph Cianculli testified for the government. He stated that he was a first cousin of Guglielmo, whose testimony we have just quoted, and that he gave his cousin $285. The following is an excerpt from his further testimony:

"Q. What did he say to you when you met him the next time? A. He said he gave $285 to go to Canada. After that Mr. Giordano—Mr. Di Salvo asked all these men—Mr. Di Salvo say Mr. Giordano says some more money, and my cousin asked me for another $215 for giving Mr. Giordano.

"Q. Did you give it to him? A. I did.

"Q. In all you gave him $500? A. $500.

"Q. Guglielmo told you he gave $285 to Giordano; is that right? A. Yes, sir.

"Q. Are you sure of that? A. I gave it to him; he told me he gave it to him.

"Q. He told you he wanted $285 to give to Giordano? A. Yes.

"Q. And you gave him $285? A. Yes, sir.

"Q. And Guglielmo came back and told you that he gave $285 to Giordano? A. Yes.

"Q. Now you are sure of that, aren't you? A. I am sure.

"Q. You are positive that Guglielmo told you that? A. Yes."

[1, 2] It is claimed that this testimony was erroneously admitted, and that Cianculli should not have been permitted to state what Guglielmo told him he had done with the money. But the testimony shows that Guglielmo was a party to the conspiracy, and the record discloses that he had entered a plea of guilty to the indictment. Evidence of his acts and declarations in carrying or attempting to carry into effect the conspiracy was competent as against the defendants. Clune v. United States, 159 U. S. 590, 593, 16 S. Ct. 125, 40 L. Ed. 269. And as Guglielmo's acts and declarations were admissible as against the appellants, there can be no question as to the right of the court to admit in evidence the statements made to Cianculli as to what Guglielmo did with the money which Cianculli gave him to enable him to accomplish the objects of the conspiracy.

It appears Di Salvo was allowed to testify to a transaction which occurred after the aliens returned from Canada and the conspiracy was at an end. They returned in March, and the testimony objected to related to a matter which happened some time in the following April, when he met Philip Giordano. It appears that one Sanitario, of this party of Italians, declined to pay $500 put up by each of the others, and did not go with them to Canada. But after the aliens came back from Canada the testimony was he decided to pay $500 and go. Then he changed his mind again, and reported to the Commissioner of Immigration what Giordano had done. Di Salvo testified he thought it might have been in April that Philip Giordano sent for him, and that the following conversation occurred:

"Q. Will you tell the jury what then he said? A. Then Mr. Giordano sent for me; it was right in his place, in his office; it was a hurry call. I went down there and found Antonio Sanitorio there with one of his brothers-in-law. Mr. Giordano gave him $500 before me, which he took then.

"Q. Philip Giordano?

"Mr. Abrusso: I move to strike all that out as not connected with this case.

"The Court: The objection will be overruled.

"Mr. Abrusso: Exception.

"Q. Go ahead. A. Well, he gave this Sanitario $500.

"Q. Philip Giordano gave $500 to him?

"Mr. Abrusso: He said 'we.'

"The Witness: Giordano gave to Sanitario $500 before me. I did not count the money, but it was all right; but it was $500.

"Q. What else was said? A. That was all; then we went home.

"Q. You say he told you about trouble; what did he tell you about trouble? A. This Sanitario had reported all that Giordano did to the Commissioner of Immigration.

"Q. What is that? A. That Giordano took $500 from him; that he had to send those fellows up to Canada; and then Sanitario he changed his mind after, and he reported all these troubles to the Commissioner of Immigration."

[3] As the conspiracy was terminated in March, this testimony as to the payment of $500 by Giordano in April was inadmissible. Assuming that Sanitario had paid $500 to Giordano, he paid it after the conspiracy charged in the indictment had terminated by the return of the aliens from Canada in March. The testimony, both as to what Giordano said that Sanitario said and as to the return of the money, is irrelevant, as not being connected with the conspiracy charged in the indictment.

In United States v. Gooding, 12 Wheat. 460, 469, 6 L. Ed. 693, Mr. Justice Story, writing for the court in 1827, said: "In cases of conspiracy, * * * when once the conspiracy is established, the act of one conspirator, in the prosecution of the enterprise, is considered the act of all, and is evidence against all. Each is deemed to consent to, or command, what is done by any other, in furtherance of the common object." But it is equally well settled that, upon an indictment for conspiracy, the acts or declarations of one conspirator, made after a conspiracy has ended, are not admissible in evidence against the other conspirators. Logan v. United States, 144 U. S. 263, 309, 12 S. Ct. 617, 36 L. Ed. 429; Brown v. United States, 150 U. S. 93, 98, 14 S. Ct. 37, 37 L. Ed. 1010; Fain v. United States, 209 F. 525, 126 C. C. A. 347; People v. McQuade, 110 N. Y. 284, 307, 18 N. E. 156, 1 L. R. A. 273. This court has had occasion to apply the rule last stated. See Erber v. United States, 234 F. 221, 228, 148 C. C. A. 123; Feder v. United States, 257 F. 694, 696, 168 C. C. A. 644, 5 A. L. R. 370; De Luca v. United States (C. C. A.) 299 F. 741, 745. See, too, Marshall v. United States, 197 F. 511, 117 C. C. A. 65.

[4] But in the cases in which we have reversed because of the admission of such evidence it has been for the reason that upon the record we were unable to say that the testimony was not prejudicial. In the case now under consideration it appears to us perfectly clear that the inadmissible testimony was not prejudicial. It is quite true that it should not have been received, but that the verdict of the jury was in the least degree affected by it is to us inconceivable. Di Salvo's previous testimony as to the payment of $2,000 and the subsequent statement of Philip Giordano that the amount was not enough, and his demand for $500 more from each alien, that they were to go to Canada and in a few days return, confirmed in its essentials as it was by the testimony of other witnesses, made it impossible, if the jury believed Di Salvo at all, to reach any other verdict than the one they returned. Accocella testified to a conversation with Philip Giordano, in his presence, that he wanted $2,000, and to the payment of that amount, and to the trip to Canada. Di Gugliclmo testified that Philip Giordano in his presence said he wanted "$2,000 for the seven people," and subsequently that he wanted $215 more for each one. Mielle's testimony is that the money was paid in his presence in Philip Giordano's house.

[5] What difference could it possibly make that Di Salvo testified that Philip Giordano subsequently paid back $500 to Sanitario? Irrespective of that testimony, the evidence was abundant of the fact of the conspiracy and of the guilt of both defendant appellants. It could have worked no harm, and to reverse on that account simply tends to increase discontent with the administration of criminal justice in the United States. A judgment will not be reversed because of the erroneous admission of evidence, where the legal evidence abundantly establishes the case, or where it is apparent that the verdict would or must have been the same had the evidence not been admitted.

The Supreme Court in Williamson v. United States, 207 U. S. 425, 431, 28 S. Ct. 163, 172 (52 L. Ed. 278) quotes approvingly from Holmes v. Goldsmith, 147 U. S. 150, 164, 13 S. Ct. 288, 292, 37 L. Ed. 118, the following passage: "Courts of error are specially unwilling to reverse cases because unimportant and possibly irrelevant testimony may have crept in, unless there is reason to think that practical injustice has been thereby caused."

Judgments of conviction are affirmed.

MANTON, Circuit Judge (dissenting). Judge ROGERS' carefully prepared opinion concedes the error of the admission of the following testimony:

"Q. When did you next meet Philip Giordano? A. The next time I met him was he had some trouble with Giovanni Sanitario.

"The Court: Has Giovanni Sanitario got anything to do with this case?

"Mr. Cotter: He is not mentioned in the indictment, if your honor please, but he also was being considered.

"The Court: Go ahead.

"Q. What conversation did you have with Philip Giordano at that time?

"Mr. Abrusso: May we fix the time at this time—about April 5th?

"The Court: Fix the time.

"The Witness: I said about a month after—six weeks after.

"Mr. Abrusso: Some time in April.

"The Witness: Some time in April might be; I don't remember the date.

"Q. Will you tell the jury what then he said? A. Then Mr. Giordano sent for me; it was right in his place, in his office; it was a hurry call. I went there and found Antonio Sanitorio (sic?) there with one of his brothers-in-law. Mr. Giordano gave him $500 before me, which he took then.

"Q. Philip Giordano?

"Mr. Abrusso: I move to strike all that out as not connected with this case.

"The Court: The objection will be overruled.

"Mr. Abrusso: Exception."

This transaction took place after the conspiracy was carried out by the return from Canada of the seven aliens mentioned in the indictment. To allow it to appear that Giordano was engaged in a similar unlawful act, and in this instance giving back $500 to Sanitario, who was not in any way connected with the charge of the indictment, was creating an atmosphere prejudicial to the plaintiffs in error. After the arrest of the Italian aliens, and some weeks after the consummation of the conspiracy, the plaintiffs in error are made to appear that they repaid Sanitario $500, which he is assumed to have given them. It is an elementary rule that a defendant may not be convicted of a crime charged in an indictment by showing that he had committed other crimes. Evidence of like character has repeatedly been held to be prejudicial and to require a reversal. Erber v. U. S., 234 F. 221, 148 C. C. A. 123; Wolf v. U. S. (C. C. A.) 290 F. 738; Marshall v. U. S., 197 F. 511, 117 C. C. A. 65. To prove that plaintiffs in

error had a similar transaction with Sanitario, and were now caught paying him back his money, is anything but a harmless piece of testimony. It put them in the position of accepting money in a similar transaction in return for alleged political "fixing," and, now that discovery was at hand, they were admitting guilt by paying back Sanitario. This is not the kind of error that we may call harmless or unprejudicial. Scheinberg v. United States, 213 F. 757, 130 C. C. A. 271, Ann. Cas. 1914D, 1258; MacDonald v. United States (C. C. A.) 264 F. 738.

I dissent.