**LEWIS et al. v. UNITED STATES.**

**BERMAN et al. v. SAME.**

**No. 5630.**

Circuit Court of Appeals, Ninth Circuit. Feb. 10, 1930.

Rehearing Denied March 24, 1930.

Otto Christensen and S. C. Lewis, in pro. per., both of Los Angeles, Cal., for appellants.

S. W. McNabb, U. S. Atty., and Ames Peterson and Donald Armstrong, Sp. Asst. U. S. Attys.; all of Los Angeles, Cal.

Before RUDKIN, DIETRICH, and WILBUR, Circuit Judges.

WILBUR, Circuit Judge.

The appellant Lewis, an officer, and appellant Berman, an agent, of the Lewis Oil Corporation, were convicted of using the mails to defraud, in violation of 18 USCA 338 (section 215, U. S. Criminal Code) and also of a conspiracy with each other and certain other defendants to violate the same. The fraud consisted of selling the unsecured promissory notes of the Lewis Oil Corporation by means of certain alleged false and fraudulent representations, hereinafter set forth with more particularity, concerning the promisor corporation, its financial condition, and the arrangements that had been made by it for the payment or sale of said notes and for the use of the proceeds derived from said notes.

The Lewis Oil Company, hereinafter referred to as "the Company," was engaged in the production, refining, and sale of petroleum and its products. It owned leases upon oil-bearing land upon which there were producing wells, and upon which it was engaged in drilling other wells, it owned oil refineries, and directly or indirectly owned some wholesale and retail distributing stations for the sale of oil and gasoline. It also owned or claimed to own stock in certain other corporations engaged in various branches of the oil business. The operations of the company were on a large scale. In its financial statement of March 31, 1923 (seven months before the date of the notes which were sold), the total assets of the corporation were given as $6,824,194.03, its liabilities, "Current and Deferred," as $155,761.40, leaving net assets of $6,668,432.63, with capital stock outstanding of $6,577,164.05, and a surplus of $91,268.58. These assets were shown as $3,730,512.77, investments in oil lands, leases, development, and refineries, etc., less estimated depreciation of $27,687.20 and $2,065,267.26, invested in stock, and $321,000 in lands of subsidiary companies. The working capital was stated as $414,316.01, less current liabilities of $100,702.63, leaving net "working capital" $313,613.38. Thus it will be seen the debts of the corporation were about one-fourth of the cash on hand.

The alleged misrepresentations set out in the indictment may be briefly summarized as follows:

(1) That notes would be issued for $500,000 only.

(2) That the financial affairs of the company were in a prosperous condition.

(3) That the interest and the notes would be paid promptly when due.

(4) That the proceeds derived from said notes would be used to establish gasoline filling stations throughout the United States, and that additional valuable properties would be purchased therefrom.

(5) That the principal part of the proposed issue of notes had been subscribed by an English syndicate, and that only a small portion was available for others, and that, if the purchasers desired to resell, the appellants would see that they were sold at a profit.

(6) That the money necessary to redeem the entire issue of notes at maturity was then on deposit in a New York City Bank.

(7) That the company owned filling stations in the state of Ohio which made a substantial profit the year ending March 31, 1924.

(8) That persons purchasing said notes by transfer of securities to the company in lieu of cash could have said securities returned whenever desired, as appellants would resell said notes.

These representations, it was alleged, were false in the following particulars: Instead of selling only $500,000 in notes, over $1,000,000 were sold; that the purchasers were not making a profitable investment; that the defendants did not intend to pay such notes,

but did intent to convert the proceeds to their own use; they did not intend to, and did not, use the proceeds of said notes to establish gasoline or oil stations or to extend the business of the corporation, but did intend to convert the proceeds to their own use, and had never secured options and real property for that purpose. It owned no filling stations in Ohio, no notes had been subscribed for by an English syndicate, and defendants intended to sell, and did sell, the whole issue to the stockholders in the company and to the public generally; that there was no intention to resell the notes as promised, and no prospect of an increase in value due to sales in England as represented. There was no money in bank in New York to meet the principal and interest of said notes. It was also represented that the company had a contract with an English syndicate to purchase the notes at a premium of thirty per cent. and that the purchasers by resale could and would, if desired, receive the thirty per cent. premium and the principal they had invested within sixty or ninety days, but there was no such contract. It was represented that, if such sale was not effected, the Lewis Oil Company would repurchase the same at a premium over the face value, but there was no intention that this should be done. It was represented that the investors in said notes would make a profit, when the appellants knew they would not, and they did in fact lose the money paid for said notes. It was represented that the notes were secured by mortgage. This was not true. It was represented that the notes were bonds. They were not. It was represented that the company was making substantial net earnings, and would pay dividends upon the outstanding stock, when in fact the company was operating at a loss and no dividends were paid. It was represented that the stock of the company would be listed upon the New York Stock Exchange, and there was no intention so to do nor was application therefor made as promised.

It was represented that the company would drill oil wells in which interests would be given to the purchasers of these notes. This was not done, and there was no intention to do so. It was not intended to pay these notes, and they were not paid, and no interest thereon was paid after November 1, 1926. It was represented that the earned net income for the year ending March 31, 1923, was more than three times the entire interest charges upon those notes. That would be $120,000 if only $500,000 were sold as represented, or $240,000 (three times $80,000) if $1,000,000 of notes were sold, whereas the company was in fact operated at a loss for that year. It was represented that the company owned a controlling interest in the Julian Petroleum Company. This was false, and known to be so by the appellants. It was represented that the company was in a strong financial condition and operating at a profit, and would continue to do so. This was false, and known by the defendants to be so. These allegations were put in issue by the appellants' plea of not guilty.

■ At the outset, it should be noted that, if any one of the material representations made were false and known to be so by the appellants, and that purchases were made in reliance thereon, the conviction must be sustained, regardless of the proof or failure of proof of other items of alleged fraud.

It is clear from the evidence that the alleged representations concerning the English syndicate were made as alleged, whereas no such sale was made to an English syndicate, nor was such a sale contemplated. The nearest approach to such a sale and such a syndicate was the employment of brokers to make sales, not at one hundred and thirty per cent. but at eighty-five per cent., of the principal. A resale to such syndicate at the price proposed would mean a loss of fifteen per cent. instead of a gain of thirty per cent. If there had been a specific finding on this item by the jury, it would be unnecessary to consider other items or the evidence thereon, and the same is true as to the promise fraudulently made that the issue would not exceed $500,000, and that the notes were a lien on the property of the company. The sufficiency of the evidence to support the verdict on these issues is not challenged, nor, indeed, is it questioned by the appellants on any issue. Their sole contention is that the trial court erred in its rulings on the evidence, and in the refusal to give certain requested instructions.

■ It is necessary to consider these questions, notwithstanding the abundant proof of fraud, to ascertain whether or not there is any error which affects the substantial rights of the appellants, as only in that event is a reversal of the judgment justified or permitted. 28 USCA § 391. Reversal will not result from error, unless from the whole record it appears to have been prejudicial. Rich v. U. S. (C. C. A.) 271 F. 566; Hall v. U. S. (C. C. A.) 277 F. 19; Simpson v. U. S. (C. C. A.) 289 F. 188; Armstrong v. U. S.

(C. C. A.) 16 F.(2d) 62; Haywood v. U. S. (C. C. A.) 268 F. 795; Williams v. U. S. (C. C. A.) 265 F. 625; Williams v. Great Southern Lbr. Co., 277 U. S. 19, 26, 48 S. Ct. 417, 72 L. Ed. 761. The government introduced the books of the company, and documentary evidence from the files and records of the company, and called J. R. Espinosa, an expert accountant, to explain the significance of these records to the court and jury. The appellants objected to the introduction of these books and records and to certain questions propounded to the expert witness concerning these accounts. These books were very voluminous, and with the documents introduced as exhibits numbered 581 in all. The accounts were extremely complicated, owing to the range, variety, and number of transactions. One of the principal objections to the expert's deductions from the books and records is that his statements were conclusions, and therefore inadmissible, but the reason for utilizing an expert accountant is that he may explain the technical significance of the account books, that is, of the nature and character of the entries, whether debit and credit, etc., and to deduce therefrom whether the books do or do not show certain facts in issue. In the strict sense of the term, he does not testify at all, except as to the accuracy and good faith of his deductions. He fills the same function as an adding machine, or a mechanical computer. He states conclusions, but they are, or should be, merely interpretive of accounts and matters in evidence which are subject to interpretation by others as well as himself, and which the jury may also interpret in accordance with or at variance with his view. In this case, for instance, as to the amount of notes outstanding at a given time, and as to whether the books showed an operative profit or loss, this witness stated that the books and records of the company showed an operative loss for the fiscal years ending March 31, 1923, 1924, 1925, 1926, 1927. The witness, either on direct or cross-examination, gave fully his reasons for his statements, or conclusions, so that the jury was fully advised of the situation, and arrived at their own conclusion as to the facts. In order to more fully present the situation shown by the record, it will be necessary to more fully state the facts with reference to certain properties shown by the books of the company as assets.

The witness Espinosa testified from the books and records in evidence that on March 31, 1924, the corporation had a deficit of $304,578.14; on March 31, 1925, a deficit of $2,234,419.33; on March 31, 1926, a deficit of $4,618,052.67; and on April 1, 1927, a deficit of $5,266,287.95; that the aggregate assets as shown by the books on May 20, 1927 were $12,377,329.96. One of the assets of the company consisted of leases of oil lands in Louisiana. These properties, which we will refer to as the Louisiana properties, were contracted to be exchanged with the Julian Petroleum Corporation on a valuation of $2,250,000 for 120,000 shares of the preferred stock and 301,000 shares of the common stock of that corporation. Certificates of stock representing these shares were signed by the proper officers of the Julian Petroleum Corporation, the corporate seal was impressed thereon, and $3,000 in internal revenue stamps affixed thereto. The contract calling for the exchange was duly executed and delivered, and the assignments of the Louisiana properties from the company to the Julian Petroleum Corporation were signed. Appellant S. C. Lewis was at that time president of the company and also of the Julian Petroleum Company. He now contends that neither the stock nor the assignments were delivered, and that consequently the deal was not closed and the Louisiana property remained the property of the company. It appears, however, that appellant Lewis from time to time directed sales to be made of the stock represented by the above-mentioned certificates in the name of the company, and that the money derived therefrom was paid into the treasury of the Julian Petroleum Corporation. Over $600,000 was thus secured by the Julian Petroleum Corporation from the transfer and sale of stock thus represented by the certificates to the company.

Later on, appellant Lewis caused, or purported to cause, the Louisiana properties of the Lewis Oil Company to be transferred by the Julian Petroleum Company to the California Eastern Oil Company of which appellant Lewis was also president, as follows: On August 1, 1926, the appellant Lewis, a president of the Julian Petroleum Corporation, offered to transfer to the California Eastern Oil Company of which he was also president, in consideration of 750,000 shares of stock of that corporation to be issued to the Julian Petroleum Corporation, the Louisiana properties theretofore owned by the company (Lewis Oil Company), of which he was also president. This proposal was accepted on August 4, 1926. On November 16, 1926, appellant Lewis wrote to an accounting firm in charge of the account books of the Julian Petroleum Corporation in Los An-

geles, stating that he, jointly with the Lewis Oil Company, was operating the Louisiana property for the account of the Julian Petroleum Corporation, the proceeds to be paid "either to the Lewis Oil Company or to myself." These accountants were directed to debit the appellant Lewis personally with the oil produced from said leases "and credit same to me on payments made into the Broadway Central Bank in N. Y. which your auditors will certify was used for dividend purposes"; that is, the oil from the Louisiana properties previously or then owned by the Lewis Oil Company was used by appellant Lewis to pay dividends on the stock of the Julian Petroleum Corporation in November, 1926.

Later, on April 23, 1927, appellant verified a statement filed with the California corporation commissioner on behalf of the California Eastern Oil Company, of which he was still president, stating that it had issued 750,000 shares of its stock for the Louisiana properties "previously owned by the Julian Petroleum" Corporation. In this state of the case, with its Louisiana properties ostensibly transferred, first, to the Julian Petroleum Corporation in consideration of stock later sold by that company to the public, at the instance of appellant, and later transferred by that company to still another company also under the domination of appellant Lewis, the expert accountant explained that under those circumstances he would cancel, or charge off, the Louisiana properties as an asset of the Lewis Oil Company and charge S. C. Lewis with $2,200,000, their value. This, of course, was a conclusion of the accountant. If the question in issue had been the amount of the claim of the company against Lewis, such a statement of such a conclusion might well be objected to as taking from the jury the very fact in issue, but the issue here was the good faith, or rather lack of it, in the representations made by the appellants concerning the prosperity of the company and its stability and credit, and concerning the lack of good faith in the promises to redeem the notes made in consummating the sale of the notes in question. In this connection it should be noted that the stock of the Julian Petroleum Corporation had been overissued, as appears by the statements of counsel, and that the stock purporting to be represented by the certificate executed to the Lewis Oil Company did not in fact exist.

We conclude that the opinion of the expert as to the proper book entries to be made under the circumstances was immaterial. The only effect of that testimony was to attract the attention of the jury to the fact that the books of account did not show proper or any entries concerning the juggling of these corporate assets which were carried on the books of the company as its property, notwithstanding the transactions mentioned. At most, the transaction represented the exchange of over $2,000,000 worth of real estate for a lawsuit of dubious result.

Another somewhat similar and earlier transaction is involved in the conclusions of the expert witness. The company issued promissory notes in exchange for certain oil leases in California. These will be called California properties. These were transferred to the Julian Petroleum Corporation in December, 1924, in purported exchange for its capital stock. The stock was never issued to the Lewis Oil Company. Stock certificates for 26,600 shares of the preferred and 16,950 shares of the common stock of the Julian Petroleum Company, being the amount of the stock of the latter company agreed to be issued to the Lewis Oil Company in exchange for the California properties, were made out at the direction of appellant Lewis acting as president of the Julian Petroleum Corporation in the name of the Lewis Oil Company. These stock certificates were not delivered to the Lewis Oil Company. All but 33 shares of the 26,600 shares of preferred stock were, however, issued to others on transfer therefrom at the instance of appellant S. C. Lewis; 12,816 shares were thus issued to appellant Berman. The appellant Lewis testified that the Julian Petroleum Corporation received the money therefor. On this basis the expert struck off the California properties as an asset of that company, and charged appellant Lewis with $1,209,263.55, the value thereof. Whether or not this conclusion was a legally correct solution of the difficulty is not particularly important to the issue here. If the testimony of the expert witness as to the proper bookkeeping entries under such circumstances was prejudicial to the defendant Lewis or Berman, such prejudice was a legitimate and inevitable result of the character of the transaction in which they were shown by other evidence to be involved rather than by the, perhaps erroneous, legal conclusion of the expert witness as to the proper book entries to be made under such circumstances.

As to the contention that the books offered were not all the books of the company, it is sufficient to say that they contained all that was necessary to show the general condition

of the company's business; indeed, so far as appears, they were all of the books of the company. It appears from the testimony that appellant Lewis, as president of the company, directed the bookkeepers and accountants of the company to make entries in these books reflecting his interpretation of the company's transactions, among other things concerning the purchase and sale of the California properties and the situation concerning the Louisiana properties. See, on this general subject, Bettman v. U. S. (C. C. A.) 224 F. 819, 830; Lewy v. U. S. (C. C. A.) 29 F.(2d) 462, 464, 62 A. L. R. 388. In view of these general conclusions, it will be unnecessary to consider in detail the one hundred and three assignments of error covering one hundred eighty pages of the transcript. Some of these, however, specified in the brief, will be now considered.

■ A certified copy of the income tax return to the United States Internal Revenue Department for the year ending March 31, 1924, was introduced in evidence. This return showed a loss of $378,000 for the year. Another return for the calendar year 1923, that is, the year ending January 1, 1924, signed by the appellant Lewis, showing a loss of $396,000, was also received in evidence. These returns made to the government, purporting to show the condition of the company, were properly received in evidence, without other proof than the certificate of the governmental custodian thereof. 28 USCA § 661, Rev. St. § 882; Lewy v. U. S. [C. C. A.] 29 F.(2d) 462, 62 A. L. R. 388. That they were returned by a corporation named the Lewis Oil Company, and purported on its face to be executed by the officers of that company, was sufficient prima facie proof that it was a return made by the company. Moreover, the appellant Lewis, in rebuttal, sought to explain the apparent discrepancy between these returns showing a loss and the balance sheets of the corporation showing a profit; thus recognizing that these returns were in fact those of the company. The explanation thus made was that in the financial report to the directors no deduction was made for "depreciation and depletion," while depreciation was charged off as a loss in the return to the government. This testimony cured the error, if. any, in the reception of these returns. Appellant claims that all the evidence concerning the sale of the Louisiana properties to the Julian Petroleum Corporation should have been excluded. In view of the fact that the appellant was claiming that these properties belonged to the California

Eastern Oil Company, of which he was president, as hereinbefore stated, the evidence was proper to show the lack of good faith in appellant's representations and dealings with the corporation's assets and in the representations made at the time of the sale of the notes.

■ In this connection the appellants asked the court to instruct the jury that the contract between the company and the Julian Petroleum Company and the assignments executed in pursuance thereof were not effective to divest the company of these properties, unless they were delivered, and that, unless such assignments were delivered, they were to disregard the instruments and the testimony of the expert accountant debiting Sheridan C. Lewis with $2,250,000. This instruction, if given, would have left the jury wholly at sea as to what would constitute a delivery under the peculiar circumstances of the case where the appellant Lewis, as president of the Julian Petroleum Corporation, the grantee, and also as president of the grantor, treated the deal as fully consummated, and had actual possession of the assignments, and of the stock certificates issued in pursuance of the agreement. Certainly the appellant Lewis could not be heard to say that the delivery was not made if the company desired to enforce the contract on the theory that it had been consummated by delivery of the assignments. The instruction was properly refused, the court declined to consider the question of the comsummation of this deal as a major issue of the case, but properly treated it as mere evidence of the methods of the appellant, in dealing with the property intrusted to his care, giving the following instruction on that subject:

"Much testimony has been received with reference to the claimed assignments by the Lewis Oil Corporation of certain properties in Louisiana to the Julian Petroleum Corporation. You must carefully scrutinize all the evidence bearing on that subject and determine what the true intent of any of the defendants therein concerned was in that re gard."

The appellants objected to the introduction and use of the books of the company against them; but the books of the company were introduced to show that the financial condition of the company was not as represented by the appellants. It was the nature and character of the representations made by the appellants which made the books of the company proper evidence against them for that purpose. No other feasible method sug-

gests itself to us for proof of the condition of the company, and none is suggested by the appellants.

The appellants also objected that no proper foundation was laid for the introduction of the books and also to their use for ascertaining the financial condition of the company, on the ground that all of the books of the company and all of its subsidiary and allied corporations were not produced. It was shown that the books produced were the books of account of the company kept for the purpose of recording the business transactions in which the company was involved. This was a sufficient foundation for their introduction for the purpose for which they were offered. If it had been sought to prove some special charge in the books as a basis for a recovery against the appellants, more evidence concerning the individual book entries involved might have been necessary to make such entries evidence in favor of the company against a third party, but this question is not involved here.

The appellants assign as error the introduction of evidence over their objection concerning the issuance of stock of the Julian Petroleum Corporation charged against the stock certificate of the Lewis Oil Company, signed, sealed, and stamped, but which it is claimed was unissued and undelivered. As the appellants had represented to the purchasers of the notes that the Lewis Oil Company owned a controlling interest in that corporation, and it was charged in the indictment that this representation was false, the evidence was competent on that issue. Furthermore, whatever may have been the relative legal rights of the two corporations, both under the direction and apparently under the domination of appellant Lewis, the evidence was proper to show the intention of the appellant Lewis with reference to the Lewis Oil Company and the lack of good faith of appellants in the glowing promises made to the purchasers of the notes in question. Appellant Berman, writing under one of his many aliases, "J. Bennet," from the offices of the Lewis Oil Company, advised a holder of some of the notes in question to buy stock in the company because it owned sixty-five per cent. of the common stock of the Julian Petroleum Corporation, "which will pay Lewis Oil Corporation stockholders a very handsome dividend this year," whereas, it was testified, as already stated, that the 120,000 shares of Julian Petroleum Corporation preferred stock were sold by the Julian Petroleum Corporation for $600,000, and the stock thus issued charged to the Lewis Oil Company's certificate, and the money paid into the treasury of the Julian Petroleum Corporation. It was also testified that the common stock covered by the certificates to the Lewis Oil Company were disposed of in the same way. This evidence was properly received.

Appellants complain of the introduction of correspondence between appellant S. C. Lewis and W. K. Baldwin concerning the purchase of stock in the Julian Petroleum Corporation, wherein it was represented by appellant Lewis that the purchasers could reasonably expect to double their money within ninety days. It was represented that the stock had had a phenominal raise in value from $6 to $35 in the past twelve months. The letter was not introduced to prove an independent fraud, but to show Lewis' representations to Baldwin concerning the relationship of the Lewis Oil Company and the Julian Petroleum Corporation, and his knowledge of, and dealing with, Baldwin, who had purchased notes from the other defendants, Aiken, Steppe, and Berman, amounting to $33,000. The evidence was properly admitted. Appellants offered an instruction to limit this evidence to establishing the relationship or acquaintanceship of W. K. Baldwin and S. C. Lewis. The refusal to give this instruction is assigned as error. It is true that the evidence was offered and received for that purpose, but the correspondence also showed that appellant Lewis was proposing to his costockholders in the Lewis Oil Company a speculative pool in the stock of the Julian Petroleum Corporation in which both were supposed to be interested by reason of the holdings of the Lewis Oil Company in the Julian Petroleum Corporation, and was admissible on the question of the good faith of the appellant in making the representations and promises made to the purchasers of the notes and in dealing with the property of the Lewis Oil Company. The instruction was therefore properly refused. The court, however, did instruct the jury that it could not convict the defendants for any crime not alleged in the indictment. This was sufficient to guard against the possible misuse of the correspondence between W. R. Baldwin and S. C. Lewis and the evidence in relation thereto.

Appellants complain of a statement made by the government's attorneys in an argument on an objection interposed by the appellants to evidence concerning the transfer of the Louisiana properties to the Julian Petroleum Corporation. In response to a

question as to whether or not the $600,000, hereinabove referred to as having been received by the Julian Petroleum Corporation in sales of the stock charged to the Lewis Oil Company, could be traced on the books of the Julian Petroleum Corporation, the attorneys stated that they had been informed that something over $108,000,000 had passed in these transactions, and only six or seven millions were traceable on the books. This statement was not excepted to. On the contrary, appellant Lewis, acting as his own attorney, offered an explanation of the affairs of the Julian Petroleum Corporation. The appellee claims that this colloquy occurred while the jury was absent, having been excused during the argument. This is not shown by the record, and is immaterial, in the absence of an exception or assignment of error made at the time. It may be that no exception was reserved, for the reason that the jury was absent.

■■■ The government called a New York broker, Orion N. Steelman, who testified that he had dealt in the stock and the above referred to notes of the Lewis Oil Company from April 18, 1924, to February 7, 1927. He testified that the lowest price he paid for the notes was eight and one-half per cent. of the face value, and the highest price forty-one per cent., and that the highest price he had sold them for was sixty-five per cent. and the lowest ten and one-half per cent. Timely objection was made to this testimony and to the introduction of cards kept by the witness in his ordinary course of business recording these sales. The cards were offered and received in evidence over the objection of the defendants, and were used by the witness to refresh his memory. The apparent purpose of the government in the introduction of this evidence was to show that the defendants knew that the notes were not of the value they represented them to be. To this end it was shown that one of the codefendants and alleged conspirator, C. O. Steppe, purchased these notes from this witness at forty-four per cent. of their face value. The evidence of his purchases was admissible against C. O. Steppe to show his knowledge of the value of such notes, and his knowledge was also admissible against his alleged coconspirators. There is some doubt in the record whether the witness was testifying of his own knowledge as to sales made by him and shown by his cards, or whether he was using such cards as memoranda to refresh his memory, or whether the cards themselves were received as documentary evidence of the facts therein stated.

Some of the testimony is clearly given by the witness from his own memory. Although there was technical error in the reception of some of this evidence, in view of the more direct evidence in detail of the value of the notes and of the falsity of the representations made by the appellants, this evidence cannot be said to go to the substance of the charge or to justify a reversal of the judgment. Giordano v. U. S. (C. C. A.) 9 F.(2d) 830, 837; Rossi v. U. S. (C. C. A.) 278 F. 349; Bain v. U. S. (C. C. A.) 262 F. 664.

A carbon copy of a letter purporting to be from the Lewis Oil Company addressed to appellant Berman was received in evidence. Appellants objected to the reception of this letter on the ground that there was no evidence that the letter was signed or mailed. It was proved, however, that the letter was dictated by one of the codefendants, Harris, who died before the trial, and was therefore admissible as the declaration of a coconspirator during the existence of the conspiracy.

So far we have not considered separately the objections of appellant Berman. Much of the evidence admitted to prove the guilt of appellant Lewis was inadmissible against appellant Berman, except on the theory that he was a coconspirator, and that therefore the conduct of and declarations of Lewis were admissible against him. On this ground it is conceded that the testimony was admissible until the conspiracy terminated. This, it is claimed, occurred, so far as appellant Berman is concerned, in July, 1925. We think, however, notwithstanding the testimony of appellant Lewis, that the jury were justified in concluding that the joint enterprise was not terminated. For this reason we think it unnecessary to follow in detail the objections of appellant Berman to the testimony.

■■■ We will now consider objections made to the proof on the various counts of the indictment. The first count is based upon a letter dated June 5, 1925, mailed to A. M. Epstein, Portland, Or., from Los Angeles, Cal., by appellant Lewis, as president of the Lewis Oil Company. No objection was made to the reception of this letter in evidence, and the appellant Lewis admitted that the draft on the Lewis Oil Company for $4,036.22 inclosed in the letter was signed by him. It is contended that this letter was not mailed in pursuance of the scheme to defraud alleged in the indictment. It was used for the transmission of information in relation thereto, and contained a part of the proceeds of the transaction with A. M. Epstein and his associates, brought about by some of the fraud-

ulent representations set out in the indictment. The letter was mailed as a part of the fraudulent scheme, and to aid in effecting it. The notes were still being offered to the public, and the tendency of the letter was to lull the recipient into a false sense of security as to the value of the notes he had received. This was sufficient to bring the letter under the condemnation of the statute. 18 USCA § 338; Preeman v. U. S. (C. C. A.) 244 F. 1; Newingham et al. v. U. S. (C. C. A.) 4 F. (2d) 490.

The second count of the indictment was based upon a letter addressed to A. I. Blitz, one of the associates of A. M. Epstein, and a joint owner of certain oil properties transferred by them to the Lewis Oil Company in exchange for stock and notes, July 9, 1925, at Portland, Or. Blitz testified to receiving this letter through the mail. It was on the letterhead of the Julian Petroleum Corporation and signed "S. C. Lewis." The offer of the letter was objected to for the reason that no foundation had been laid. Thereupon the following colloquy occurred between the court and Mr. Armstrong, the government's attorney:

"The Court: Bearing his signature, signed by him?

"Mr. Armstrong: Signed by S. C. Lewis.

"The Court: Bearing the signature of S. C. Lewis.

"Mr. Armstrong: Yes.

"Mr. S. C. Lewis: I object to the statement of counsel that it bears the signature of S. C. Lewis unless he wants to take the stand and testify to it." (The objection was overruled and an exception taken.)

While the general objection that no foundation was laid for the introduction of the letter was insufficient to raise the question of its authenticity (Freeman v. Young, 147 Ga. 699, 95 S. E. 236; Henderson v. Dreyfus, 26 N. M. 541, 191 P. 442; Chicago City Ry. Co. v. Foster, 226 Ill. 288, 80 N. E. 762; D. I. Nofziger Lumber Co. v. Solomon, 13 Cal. App. 621, 110 P. 474; Henson v. Pascola Stave Co., 190 Mo. App. 471, 177 S. W. 787; Karlen v. Trebble, 45 S. D. 570, 189 N. W. 519; In re Wong Sing (D. C.) 83 F. 147; Franklin v. Krum, 171 Ill. 378, 49 N. E. 513), the subsequent objection to the insufficiency of the mere declaration of counsel to prove the signature was sufficiently specific to raise the question of the authenticity of the letter. The question of whether or not the authenticity of a letter has been sufficiently proved prima facie to justify its admission in evidence rests in the sound discretion of the trial judge. 22 C. J. § 1109, p. 908, citing O. N. Bull Remedy Co. v. Clark, 109 Minn. 396, 400, 124 N. W. 20, 32 L. R. A. (N. S.) 519, 18 Ann. Cas. 413; State v. Uhls, 121 Kan. 587, 249 P. 597. The contents of this letter is most persuasive of its authorship. There were scores of letters and documents then and thereafter introduced in evidence bearing the original or facsimile signatures of S. C. Lewis. The original letter has been sent here with the record, and the signature to the letter is evidently that of the appellant Lewis. Under these circumstances, the jury, having been satisfied beyond a reasonable doubt of the authenticity of the letter, the error in its admission, if any, was a mere technical one, which should not require a reversal of the conviction, particularly where the authenticity of the letter was questioned in no other way than by the objection that there was no sufficient proof of the genuineness of the signature. 28 USCA § 391. The letter set out in count 6 of the indictment was received through the mails by M. H. Boesch in response to a letter directed to S. C. Lewis by Boesch. The letter was in answer to one from the witness inclosing $10,000 in notes; it announced the receipt of $10,000 in notes of the Lewis Oil Company and the payment thereof or therefor, and expresses the purpose of appellant Lewis to take up the remaining $15,000 in New York. The letter was not objected to by the appellants; it was mailed in furtherance of the alleged scheme to defraud, as in the case of the letter declared upon in count one. The evidence was sufficient to support the verdict on this count.

A letter of June 14, 1926, purporting to be from Lewis to the witness Blitz, was the foundation for the seventh count in the indictment. It was not specifically objected that the letter was not signed by appellant Lewis, but it was objected to "because of no foundation." This was not a sufficient objection to raise the question of the authenticity of the letter. See authorities above cited in discussion of count 2. The contents of the letter were also persuasive of its authorship. The evidence was sufficient to justify the verdict on this count.

The letter set out in count 8, directed to John Mehmken at Burlington, Iowa, dated March 22, 1927, was shown to have been dictated to a stenographer by appellant Lewis at Los Angeles, Cal.; to have been written upon the letterhead of the Julian Petroleum Corporation; and to have been received

through the mails by the addressee at Burlington, Iowa. This was sufficient, in view of the context of the letter, to show the use of the United States mail by the appellants, and to support the verdict.

The letter set out in count 11 was addressed to Mrs. Anna B. Sharkey, 676A East Seventy-First street N., Portland, Or., and was dated November 21, 1927. Mrs. Sharkey, to whom the letter was addressed, testified that she received it through the United States mail in the envelope which was offered in connection with the letter. This envelope was addressed to Mrs. Anna B. Sharkey at the above-mentioned address in Portland, Or., and was postmarked, Los Angeles, Calif. Nov 21 1 30 PM 1927 Arcade Sta. 5 2¢ U. S. postage stamp cancelled." The letter purports to be in answer to a letter written by Mrs. Sharkey to S. C. Lewis. This was sufficient prima faice showing of the mailing of the letter at the instance of the appellant S. C. Lewis, and to support the verdict.

Judgment affirmed.